CARL E. WELLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
EMILY I. WELLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 86488, 86489. Filed September 10, 1962.

*Norman A. Peil, Jr., Esq.,* for the petitioners.
*Max J. Hamburger, Esq.,* for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings, respondent determined deficiencies in gift tax due from petitioner Carl E. Weller (hereafter called Carl) and from petitioner Emily I. Weller (hereafter called Emily) for the year 1955 in the respective amounts of $80,680.17 and $72,481.88.

The issues for decision are:

(1) The value of interests in a limited partnership, Weller Manufacturing Company, transferred by petitioners in 1955 in trust for the benefit of seven donees;

(2) Whether Carl made a taxable gift in 1955 by reason of the sale of a 2-percent interest in Weller Manufacturing Company to Harold Beyer for less than the fair market value of such 2-percent interest; and

(3) Whether gifts in trust for the benefit of three minor children of petitioners qualify for the annual exclusions provided by section 2503 of the 1954 Code.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Carl and Emily are, and during the year 1955 were, husband and wife, residing in Easton, Pennsylvania. Each filed a gift tax return for 1955 with the district director of internal revenue, Scranton, Pennsylvania.

On May 15, 1945, Weller Manufacturing Company, Easton, Pennsylvania, was organized as a general partnership under Pennsylvania law to manufacture, buy, and sell electrical products and equipment.

The names of the partners, the capital contribution of each, and the respective percentages of ownership in the partnership were as follows:

| Name | Capital contribution | Percentage of ownership |
|------|---------------------|------------------------|
| Carl | $2,500 | 21.7391 |
| Emily | 2,500 | 21.7391 |
| R. H. Weller [1] | 2,500 | 21.7391 |
| Mamie V. Weller [2] | 2,500 | 21.7391 |
| Everett C. Weller [1] | 770 | 6.6958 |
| I. Dale Weller [1] | 730 | 6.3478 |
| Total | 11,500 | 100.0000 |

[1] Carl's brother.
[2] R. H. Weller's wife.

On August 29, 1945, the foregoing partners entered into an agreement for the conduct of the partnership business, which provided, *inter alia*, that capital of the partnership was to be contributed by the partners in the amounts and percentages set out above; that "profits of the net business" were to be paid in proportion to capital contributions; that Carl would assign to the partnership his patent for a "Speed Iron" immediately after such patent was issued to him; that R. H. Weller was to have charge of sales of the partnership and that Carl was to have charge of production; that Carl and R. H. Weller were to have full authority to fix their own compensation; that the compensation of Carl and R. H. was to be in addition to their distributive shares of partnership profits; and that the partnership was to continue despite the death of a partner.

There was issued to Carl on August 13, 1946, United States patent No. 2,405,866 by the United States Patent Office. Patent No. 2,405,866 was for a Speed Iron known as an electrical soldering iron and was to expire on August 13, 1963. Carl's application for this patent had been pending since 1941.

By assignment dated October 15, 1946, Carl assigned and transferred to the partnership all his right, title, and interest in and to the invention described in patent No. 2,405,866, and in and to all improvements thereon. As consideration for this assignment and transfer, Carl was to receive a royalty from the partnership equal to 5 percent of the net sales made by the partnership of the Speed Iron and repairs and replacement parts for a 5-year period, beginning as of May 15, 1945.

The Speed Iron is a soldering gun which is electrically operated. Its principal advantage over the ordinary soldering iron is that the heat is created directly in the soldering tip, and it can be brought to soldering temperature in 5 seconds whereas the soldering iron may require as much as 5 minutes for this purpose. Therefore, the

soldering gun can be left turned off and is not a hazard. It is ready to operate by the time it is triggered and placed to work.

When the partnership was initially formed in 1945 Carl felt that the Speed Iron had a much more limited market than it turned out to have. Carl felt that the chief market would be the electronic maintenance industry which would be saturated with a relatively few guns. But Carl's estimate was incorrect because the development of television caused an increase in the number of repairmen, and also wider use of electronics in industry and the growth of the home workshop created wider markets for the Speed Iron and its sales increased beyond Carl's anticipations.

In 1947, Weller Manufacturing Company required the services of a person with a background in sales. Robert E. Miller (hereafter called Miller), who was an electrical engineer with sales experience and contacts with numerous electronics manufacturers, was employed. To induce Miller to come with Weller Manufacturing Company an arrangement was worked out whereby he could acquire a 20-percent interest in the partnership.

On May 1, 1947, R. H. Weller and Mamie V. Weller (referred to herein as R. H. or Roy and Mamie, respectively) each sold 21 percent[1] of his and her partnership interest in Weller Manufacturing Company to Carl, Emily, Everett G. Weller (hereafter called Everett), and I. Dale Weller (hereafter called Dale) on a pro rata basis. R. H. and Mamie each received $11,555.16. On September 8, 1947, R. H. and Mamie each sold a 5-percent interest in the partnership to Miller. On the same day, Carl, Emily, R. H., Mamie, Everett, Dale, and Miller entered into an amended partnership agreement providing that partnership interests were to be as follows:

| | Percent | | Percent |
|---|---|---|---|
| Carl | 25. 25 | Everett | 7. 78 |
| Emily | 25. 25 | Dale | 7. 38 |
| R. H. | 12. 17 | Miller | 10. 00 |
| Mamie | 12. 17 | | |

In this agreement of September 8, 1947, it was agreed that if a partner decided to sell his or her interest, it was to be offered for sale to the other partners. This agreement, after giving Miller an option to acquire an additional 10 percent or 10 shares of the partnership for $2,400 per share, provided further:

6. It is understood and agreed that if R. E. Miller by his decision should leave the Weller Mfg. Company and accept employment elsewhere, he agrees to sell back

---

[1] The parties have stipulated that "On May 1, 1947, R. H. Weller and Mamie V. Weller each sold ten and one-half (10½%) percent (total twenty-one (21%) percent) of the partnership interest in Weller Manufacturing Company." This is ambiguous, but we think it is clear from the agreement of September 8, 1947, and from other stipulated facts that R. H. Weller sold 21 percent of his partnership interest, which amounted to 21.7391 percent of the partnership, on May 1, 1947. Thus, he sold a 4.5652 interest in the partnership to Carl, Emily, Everett, and Dale. Mamie did the same.

to the Company at their option that equity he acquired under Article #2. The consideration of such sale by R. E. Miller to Weller Mfg. Company shall be $2400 per share.

7. It is understood and agreed that if R. E. Miller should offer for sale that portion of his equity acquired by Article #1, R. H. Weller and Mamie V. Weller shall have first option of purchase of same.

On May 30, 1948, and May 2, 1949, Carl, Emily, Everett, Dale, R. H., and Mamie sold additional 2-percent interests to Miller.

Under date of May 2, 1949, a partnership agreement which amended the previous agreements for the operation of Weller Manufacturing Company was executed, by which the partners formed a limited partnership under the Uniform Limited Partnership Act of the Commonwealth of Pennsylvania. The following table shows the general and limited partners, the contribution of each (based on valuations appearing on the books of the old partnership which, it was recited, had been dissolved), and the share of each in the profits of the partnership:

|  | Contribution | Share in profits (percent) |
|---|---|---|
| *General partners* | | |
| Carl | $48,260 | 24.13 |
| Emily | 48,260 | 24.13 |
| Everett | 14,880 | 7.44 |
| Miller | 28,000 | 14.00 |
| *Limited partners* | | |
| R. H. | 23,260 | 11.63 |
| Mamie | 23,260 | 11.63 |
| Dale | 14,080 | 7.04 |

General partners were to share losses in the same percentages as they shared in profits. Limited partners were to share losses in the same proportion as they shared profits, but their losses were limited to their contributions. The general partners were each to render such services to the partnership for such salary as the general partners might agree upon and were to devote substantially all their time to their duties. The compensation of general partners was to be in addition to shares of profits. The general partners agreed that they were not to engage in any way in any other business than that of the partnership so long as it was in existence except by agreement of all the general partners.

In the event of the death of any of the general partners, an accounting was to be taken and dissolution effected. If the remaining general partners agreed to reorganize the partnership, the general partners undertaking the reorganization were to pay for the decedent's interest based on assets and liabilities as of the last accounting, plus an amount for goodwill. This value for goodwill was to be equal to 10 percent of the average annual net profits for the 5 fiscal years of the partnership (and, if necessary, of the predecessor partnership) preceding death. If there was a net loss in the year immediately preceding

death, no value was to be assigned goodwill. There was no express provision for the purchase of the interest of a retiring general partner.

As of June 30, 1949, Dale sold one-half of his interest in the partnership to Norman E. Ritter (hereafter called Ritter) for $15,480.

On January 1, 1950, Carl, Emily, R. H., Mamie, Everett, and Ritter sold, pro rata, percentages of their partnership interests to Miller. The interests which they sold aggregated 6 percent of the partnership.[2]

On June 23, 1952, Carl sold to the partnership his rights to a reissue application of patent No. 2,405,866 for 3 percent of the net sales of the Speed Iron and parts over the life of the reissued patent.

In 1952, the partnership instituted suit in the United States District Court for the Northern District of Illinois against Wen Products, Inc. (hereafter called Wen), and Drake Electric Works, alleging that the defendants were infringing United States patent No. 2,405,866, all rights, title, and interest to which had been conveyed by Carl to the plaintiff. On January 26, 1954, the District Court rendered an opinion upholding the partnership's claim of infringement. This opinion is reported at 121 F. Supp. 198. The defendants appealed, and on June 18, 1954, the Court of Appeals for the Seventh Circuit remanded the case to the District Court for the purpose of hearing new evidence offered by the defendants. Thereafter, the District Court again upheld plaintiff on April 13, 1955. Defendants appealed this decision and on March 30, 1956, the Court of Appeals affirmed (231 F. 2d 795).

The partnership and Wen entered into a license agreement on May 1, 1956, which provided that Wen was to have the nonexclusive right and license to make, use, and sell the Speed Iron embodying the invention claimed in the patent and reissue patent issued to Carl. Wen was to pay $250,000 to the partnership in settlement of all claims of the partnership for damages and attorney's fees and a royalty equal to $7\frac{1}{2}$ percent of Wen's sale price of the Speed Iron. Commencing with payments for the fourth quarter of 1957 and continuing through the third quarter of 1959, Wen began paying the royalties under protest, alleging that the foregoing license and settlement agreement constituted a misuse of the patent and violated the antitrust laws in that it provided for royalties on both copper- and steel-tipped soldering guns, whereas the patent issued to Carl applied only to copper tips. Following dismissal of a suit brought by Wen on the above allegations, subsequent royalty payments were made without protest.

In early 1953, Carl and Miller had a sharp disagreement about marketing policies. Miller resigned his employment and subsequently moved to Florida. In late 1954, Miller went to the Miami, Florida, offices of Ernst and Ernst, a firm of certified public accountants.

---

is stipulated that this sale was made pursuant to the agreement of September 8,

Miller's objective was to sell his interests in the partnership as well as his stock in Weller Manufacturing Company, Inc., Bayamon, Puerto Rico, and Weller Electric Corporation, the sales company for the products manufactured by the partnership, and he wanted professional advice as to the sale. The Miami office forwarded data relating to Miller's problem to a general partner of the firm in Philadelphia who, together with a lawyer, undertook to represent Miller in the sale of his 20-percent interest in the partnership, as well as the stock which he owned in the related corporations, to the other partners. The general partner of Ernst and Ernst, who began the representation of Miller about January 1, 1955, was experienced in the valuation of business interests and had represented both buyers and sellers, and he was to investigate the partnership and the corporations by studying earnings, balance sheets, potentials, and present conditions, in order to advise Miller as to the right price for his 20-percent interest and his stock.

Miller's adviser obtained audit reports for the partnership and of the corporations for 5 previous years, analyzed them, and arrived at a conclusion as to value. He advised Miller that a sales price of $197,625 to $237,150 for his partnership interest would be fair. He based this range on his finding that Miller's share of average earnings for 5 previous years (and for an 8-month period ending December 31, 1954) was $39,525 (before taxes), and that on the basis of 5 or 6 times such share, Miller's interest was worth from $197,625 to $237,150. He further advised Miller to try to get a cash settlement of $110,000 (which was the amount of Miller's estimated capital in the partnership) and annual payments of $17,000 to $20,000, and not to accept any profit-sharing proposal. Miller's adviser took into consideration that partnership earnings had been declining, that the District Court had by that time decided in plaintiff's favor in the patent-infringement suit, and that the decision was pending on appeal. Miller was advised of these conclusions, and his reaction was that the range for a sales price was a fair one and that he would try to get the best price he could.

On February 8, 1955, Miller, his lawyer, and his accountant met with Carl, another partner, and their accountant in Easton. Sales negotiations lasted throughout the morning. In the afternoon, the parties reached an agreement for the sale of Miller's 20-percent interest in the partnership which was incorporated in a written agreement, dated February 25, 1955, which provided that Miller was to receive $121,007.17, which represented his capital interest as shown on the partnership books, plus $15,000 per year for 5 years in consideration of past services to the partnership, plus 15 percent of any damages collected by the partnership by reason of the patent-infringement

payment. Miller was to bear 15 percent of any costs of the litigation.

Miller's adviser was not familiar with any partnership agreements to which Miller had been a party and the agreements were not mentioned in the negotiations. The price paid Miller was more than Carl and the other partners had intended to pay him before the negotiations began.

After the purchase of Miller's partnership interest, Carl decided he would like to sell a part of his interests in the partnership and the related corporations in order to obtain cash to make improvements on his home and to diversify his investments. He had no financial necessity to sell his partnership interest.

In late February 1955, Carl discussed informally with Ritter the possibility of selling a part of his interest in the partnership. Ritter contacted Harold W. Beyer (hereafter called Beyer) who was familiar with Carl and the partnership. In turn, Beyer got in touch with Robert V. H. Harned (hereafter called Harned) who was president of a corporation engaged in the general securities business. Beyer and Harned reviewed financial statements of the partnership and of the related corporations and went together to Easton to talk to Carl. Harned suggested the possibility of a public offering of stock. Carl was receptive to the idea of ultimately making a public offering, but he did not want to sell his interest in the partnership to the public generally. Harned, after a review of the financial statements and on the basis of earnings and book values, concluded that Carl's interest in the partnership and in the related corporations was worth about $1\frac{1}{2}$ times book value. He emphasized to Carl that the most practical way to dispose of a part of his interests would be to incorporate the partnership and bring all the corporations together so that sale of stock in only one corporation could be effected. Harned considered the sale of a partnership interest to be impractical, but he mentioned the possibility of a purchase to several clients, who had misgivings about buying into a partnership, particularly since its success depended entirely on one man, Carl.

Nothing came of Harned's attempt to find buyers for a part of Carl's interest in the partnership, and Harned had no further occasion to consider the partnership from an investment standpoint until 1957 when Everett attempted to sell his partnership interest together with his stock in the related corporations. Harned then conveyed an offer to Everett to buy his stock at about 80 percent of book value, but in this offer Harned presupposed that the partnership would be incorporated.

Beyer talked to persons who he thought might be interested in buying the 25-percent interest in the partnership which Carl was trying to sell. He found that generally the reaction of potential purchasers was that since about 50 percent of partnership net income would have

to be left in the partnership to provide for expansion, they could not withdraw enough of their share of the earnings to pay their individual income tax liabilities resulting from inclusion of their shares in their incomes. Therefore, they were not interested. However, Beyer did produce a group of investors who negotiated with Carl on the basis of a price of about 1½ times book value for the 25-percent interest, which Beyer considered to be the basis for the price paid Miller. But for other reasons the negotiations were dropped.

However, Beyer was still interested in purchasing part of Carl's interest, but he did not have the funds to buy a 25-percent interest, and he realized that he could not borrow funds by putting up the partnership interest as collateral. Also, he considered that the price of 1½ times book value was too high, taking into account the risks involved in the patent litigation as well as the one-product and one-man business. Beyer offered to buy from Carl a 2-percent interest in the partnership as well as 2 percent of the stock of the related corporations. The purchase price was to be at book value, and the sale was to be conditioned upon approval by the other stockholders and partners. This offer was submitted to Carl about April 27, 1955.

Carl took the offer under consideration and made computations of the proposed selling price. He calculated that the book value of 2-percent interests in the following Weller enterprises were worth the following amounts:

| | |
|---|---|
| Weller Manufacturing Co., Inc. of Bayamon, Puerto Rico | $21,380.00 |
| Weller Electric Corporation, Luquello, Puerto Rico | 668.64 |
| Weller Electric Corporation, Easton, Pa | 2,684.00 |
| Weller Manufacturing Co., the partnership | 11,618.00 |
| Weller Engineering Company | 600.00 |
| Total | 36,950.64 |

About a week after he had received Beyer's offer, Carl told him he would accept it. Beyer bought the interests for $36,950.

Beyer was not related to either Carl or Emily and dealt at arm's length with Carl in negotiating the sale. He did not believe that Carl was making a gift to him by selling him the foregoing interests. Carl did not intend to make a gift to Beyer and considered that he was getting the best price obtainable.

Under date of April 22, 1955, Carl, Emily, Everett, Roy, Mamie, Ritter, and Marjorie W. Hester (the daughter of Everett whom he had given a partnership interest on December 31, 1953) executed an agreement for the reorganization and continuation of the partnership as a limited partnership. With the exception of Marjorie W. Hester, who was to be solely a limited partner, the parties were to be both general and limited partners. The agreement set forth the amounts of capital contributed by each of the parties as general and as limited partners.

Net profits of the partnership were to be divided and net losses borne by the partners on the basis of the following proportions:

| General partners | Percent | Limited partners | Percent |
|---|---|---|---|
| Carl | 5. 6125 | Carl | 22. 4500 |
| Emily | 5. 6125 | Emily | 22. 4500 |
| Everett | 2. 5475 | Everett | 8. 8025 |
| Roy | 2. 7050 | Roy | 10. 8200 |
| Mamie | 2. 7050 | Mamie | 10. 8200 |
| Ritter | . 8175 | Ritter | 3. 2700 |
| | | Marjorie W. Hester | 1. 3875 |

Interests of limited partners were to be assignable in whole or in part, but the assignee of such an interest was to be a substituted partner only on condition that all the general partners consented thereto and if the assignor conferred such right upon the assignee.

Advances by general partners in excess of the capital contributions stipulated were to be considered debts due from the partnership to such general partner and were to bear interest.

At semiannual periods for audit of the partnership books the general partners were to agree upon the net worth of the partnership "and the value therein of each of the respective general partners." If a general partner elected to retire or withdraw from the business, the other general partners were to have the option of purchasing the retiring general partner's interest at a price based upon the agreed value of the next preceding semiannual accounting period.

On May 1, 1955, Carl conveyed a 16-percent interest in the Weller Manufacturing Company limited partnership to Marling E. Tracey (hereafter called Tracey) as trustee. Tracey was the husband of Carl's sister. The trust agreement was executed July 28, 1955, and provided that the trusts established by the agreement were to be for a term of 10 years and 90 days and were to be irrevocable.

The dispositive provisions of the trust agreement were as follows:

FIRST: Dispositive Provisions: The trustee shall divide the principal into the following shares:

1. The principal shall be divided so that each of the following parties shall receive one thirty-second ($\frac{1}{32}$) of said principal to be held under the terms of the trusts herein created: Willard B. Shively, Phillipsburg, New Jersey; Anna Wright, Easton, Pennsylvania; Evelyn Tracey, New Salem, Pennsylvania; Dorothy Allen, Farmington, Pennsylvania. In the event that any of the parties herein named should die during the term of the trusts herein created; then and in that event, the principal of the trust of which the deceased party was a beneficiary shall be distributed equally among the other trusts herein created so that the principal of each of the remaining trusts will be thereby increased by a like amount to be held under the terms of these trusts.

2. The balance of the principal shall be divided into equal shares so that there will be one (1) share for each of my children: Janet Elaine Weller, Richard Norman Weller, and Judith Ann Weller. In the event that any of my children herein named should die during the term of the trusts herein created, then and

in that event, the principal of the trust of which the deceased party was a beneficiary shall be distributed equally among the other trusts herein created so that the principal of each of the remaining trusts will be thereby increased by a like amount to be held under the terms of these trusts.

3. During the term of the trusts created in Paragraph FIRST–1, the net income of the aforesaid trusts shall be payable to the beneficiaries named therein at least annually during the term of these trusts.

4. The net income from each of the trusts set forth in Paragraph FIRST–2 shall be payable to the beneficiaries named therein.

5. At the termination of the trusts hereunder the entire principal shall revert to the Settlor or his estate.

6. If a minor becomes entitled to receive income, trustee may retain and invest the same in accordance with the provisions of these trusts covering investments by trustee. So much of said funds, as trustee may deem proper, may be expended by trustee for the maintenance, education and support of such minor. Any amounts not so required may be held by the trustee and invested in accordance with the provisions of these trusts covering investments by trustee, such accumulations to be paid over to each beneficiary as he or she attains his or her majority.

On the same date, Emily conveyed an 18-percent interest in the partnership to Tracey as trustee for the same beneficiaries under an agreement similar to that executed by Carl. Willard B. Shively and Anna Wright were a brother and sister of Emily; Evelyn Tracey and Dorothy Allen were sisters of Carl.

Under the terms of both agreements, Tracey had the power and authority to accept and retain any property as part of the trust without regard to any principal diversification and to invest in any form of property without restrictions to legal investments for fiduciaries. Both trust agreements contained the following provision:

I further request the trustee to retain the corpus of this trust and in this request I stop just short of directing the trustee to retain said corpus.

Carl sent the trust agreements to Tracey with the following letter:

*July 29, 1955*

Mr. Marling Tracey
*New Salem*
*Penna.*

Dear Marling:

Enclosed are the Trust Agreements. Will you please execute them, retain the originals and mail the copies back to me.

We also authorize you to retain for your administration work, 3% of the net income of the partnership blocks of equity before allocation to the various individual trusts.

I will give an example to further clarify this. If the total partnership earnings for a year were $300,000, there would be allocated to the 18% block, $54,000. There would probably be about ½ or $27,000 distributed to you as Trustee. You would retain 3% of the $54,000 for your fee. The other $27,000 would be left in the business to provide for expansion. At the termination of the 10 years and 90 days, it would be required that Emily pay over to the trust

the accumulated earnings retained in the business to acquire the property back in her name.

Exactly the same procedure is to be followed for the 16% block set up by me. Best regards to you and Evelyn.

Carl

CEW : kw
encl.

The net profits of the Weller Manufacturing Company partnership for the fiscal years 1950 through 1959 were as follows:

| | | | |
|---|---|---|---|
| 1950 | $237,896.34 | 1955 | $258,056.88 |
| 1951 | 239,602.39 | 1956 | 298,747.06 |
| 1952 | 170,672.23 | 1957 | 335,458.27 |
| 1953 | 190,496.03 | 1958 | 199,128.28 |
| 1954 | 144,666.37 | 1959 | 215,542.34 |

The parties have stipulated, and we so find, that the fair market value of the partnership on May 1, 1955, was $1,100,000. The net worth of the partnership on the same date was $580,940.24. The value for gift tax purposes of the equity interests in the partnership conveyed by petitioners to the trusts on May 1, 1955, was $111,000 or such amount as may be computed under Rule 50 by applying section 25.2512–5(c), Gift Tax Regs., to 34 percent of the stipulated value above.

The gifts in trust for petitioners' minor children were gifts of present interests.

The parties have stipulated, and we so find, that the fair market value of the 2-percent interest in the Weller Manufacturing Company limited partnership sold by Carl to Beyer was $22,000 at the time of the sale. The sale did not constitute a taxable gift of any amount from Carl to Beyer.

#### OPINION.

The first issue is the value for gift tax purposes of the 34-percent interest in the Weller Manufacturing Company partnership transferred by Carl and Emily to a trustee to be held for the benefit of their three minor children and four other beneficiaries for a term of 10 years and 90 days, the entire income to be distributed to or accumulated for the benefit of the beneficiaries during the term of the trusts, with the entire corpus to revert to the donors free of the trust at the termination of the trusts.

In the notices of deficiency respondent determined the value of Carl's gift of a 16-percent interest to be $365,830.96 and the value of Emily's gift of an 18-percent interest to be $411,559.73, in each instance using projected earnings of the partnership of $200,315.47, being the average of the past 5 years' earnings of the partnership, applying a present worth factor for 10¼ years (8.48785) to 16 percent and 18 percent of the projected earnings, respectively, to arrive

at totals of $272,039.67 and $306,044.54, respectively, and then adding thereto certain amounts for anticipated royalty and patent-infringement income. Respondent presently contends that the total value of the 34-percent interest transferred in trust is $316,000, determined by applying a discount factor of approximately 4.23 to the projected annual income of the trusts of $74,800 (34 percent of $220,000 projected annual net income of the business) for 10¼ years.

Petitioners claim the total value of the 34-percent interest transferred in trust was $111,000 computed under section 25.2512–5(a) and (c), Gift Tax Regs., by applying the factor derived from column 3 of Table II, contained in the above section of the regulations, for a term of 10¼ years (0.297073) to 34 percent ($374,000) of the stipulated value of the entire partnership ($1,100,000) on the date of the gift.

Section 2512(a) of the Code [3] provides that if a "gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." The gift tax provisions of the Code do not define value. Respondent is given broad powers to prescribe regulations for the enforcement of the tax. Sec. 7805. By section 25.2512 of the regulations [4] respondent has defined value for purposes of the gift tax, and methods for arriving at that value generally, and specifically with respect to particular kinds of property. Subsection

---

[3] All Code section references are to the Internal Revenue Code of 1954 unless otherwise noted.

[4] SEC. 25.2512–1 Valuation of property; in general.

* * * The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts. * * * All relevant facts and elements of value as of the time of the gift shall be considered. See §§ 25.2512–2 through 25.2512–6 for further information concerning the valuation of particular kinds of property.

SEC. 25.2512–2 Stocks and bonds.

\* \* \* \* \* \* \*

SEC. 25.2512–3 Valuation of interests in businesses.

(a) * * * The fair market value of any interest in a business, whether a partnership or a proprietorship, is the net amount which a willing purchaser, whether an individual or a corporation, would pay for the interest to a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. The net value is determined on the basis of all relevant factors including—

(1) A fair appraisal as of the date of the gift of all the assets of the business, tangible and intangible, including good will;

(2) The demonstrated earning capacity of the business; and

(3) The other factors set forth in paragraph (f) of § 25.2512–2 relating to the valuation of corporate stock, to the extent applicable.

\* \* \* \* \* \* \*

SEC. 25.2512–4 Valuation of notes.

\* \* \* \* \* \* \*

SEC. 25.2512–5 Valuation of annuities, life estates, terms for years, remainders and reversions.

(a) * * * (1) The fair market value of annuities, life estates, terms for years, * * * is their present value, determined under this section, except in the case of annuities and life insurance under contracts issued by [commercial companies] * * *. Where the donor transfers property in trust or otherwise and retains an interest therein, the value of the

1 of the section defines value as the price at which property would exchange hands between a willing buyer and seller, neither being under compulsion to buy or sell and both having a reasonable knowledge of relevant facts; further providing that all relevant facts and elements of value shall be considered, and referring to subsections 2 through 6 for further information concerning valuation of particular kinds of property. Subsection 2 pertains to stocks and bonds. Subsection 3 relates to valuation of an interest in a business, whether a partnership or a proprietorship. It repeats the general rule of willing buyer and seller contained in subsection 1, and further provides that the factors to be considered shall include the value of tangible and intangible assets, including goodwill, the demonstrated earning capacity of the business, and other factors mentioned in subsection 2 relating to the valuation of corporate stocks.

Subsection 5 deals with the valuation of annuities, life estates, terms for years, remainders, and reversions. Subparagraph (a)(1) provides that the fair market value of those interests in property, including terms for years, is their present value, determined under this section. It also provides that where a donor transfers property in trust and retains an interest therein, the value of the gift is the value of the property transferred less the value of the donor's retained interest. Subparagraph (a)(2) provides that the value of a term for years is computed by use of Table II in paragraph (f). Paragraph (c) provides that if the interest to be valued is the right to receive income of property or to use non-income-producing property for a term of years, the value of the interest is the value of the property multiplied by the figure in column 3 of Table II opposite the number of years of the term.[5]

The parties stipulated that the fair market value of Weller Manufacturing Company on the date of the gift was $1,100,000, reserving the right to introduce evidence bearing on that valuation, and the

gift is the value of the property transferred less the value of the donor's retained interest. * * *

(2) * * * The present value of an annuity, term for years, remainder or reversion dependent on a term certain is computed by the use of Table II in paragraph (f) * * *
(b) *Annuities* * * *

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

(c) *Life estates and terms for years.* If the interest to be valued is the right of a person for his life, * * * to receive the income of certain property or to use nonincome-producing property, the value of the interest is *the value of the property* multiplied by the figure in column 3 of Table I * * *. If the interest to be valued is the right to receive income of property or to use nonincome-producing property for a term of years, column 3 of Table II is used. [No applicable example. Emphasis supplied.]

[5] Paragraph (d) provides that to determine the value of a reversionary interest after a term of years, column 4 of Table II is to be used. The figures in column 4 of Table II are the corollary of the figures in column 3 so whether the value of the reversionary interest is first determined from column 4 and deducted from the value of the entire interest to arrive at the value of the term of years or whether the value of the term of years is determined by applying the figures in column 3 directly to the value of the property transferred, the result is the same.

right to introduce evidence with respect to, and argue, their respective theories on the valuation of the 34-percent income-interest transferred to the trusts, which they did.

It is obvious from reading section 25.2512 of the regulations that subsection 5 was intended to and does prescribe the method of valuation to be used in valuing the interests in property conveyed in trust here, and subsection 3, relied on by respondent, does not. Subsection 3 prescribes the method of valuing an interest in an unincorporated business given outright to the donee without limitation as to its term or use. The interest in property with which we are concerned here was not so transferred—it was limited to the right to receive income from the property for 10 years and 90 days, and the method prescribed for valuation of such an interest in property is found in section 25.2512–5 (c) of the regulations. See Rev. Rul. 58–242, 1958–1 C.B. 251. Petitioners' contention brings them squarely within the rules of section 25.2512–5 (c) and they must be sustained unless it is shown that the result is so unrealistic and unreasonable that either some modification in the prescribed method should be made, *Estate of Irma E. Green*, 22 T.C. 728 (1954), *Huntington National Bank*, 13 T.C. 760 (1949), or complete departure from the method should be taken, and a more reasonable and realistic means of determining value is available. See *Ithaca Trust Co.* v. *United States*, 279 U.S. 151 (1929) ; *Commissioner* v. *Marshall*, 125 F. 2d 943 (C.A. 2, 1942) ; *McMurtry* v. *Commissioner*, 203 F. 2d 659 (C.A. 1, 1953) ; *Betty Dumaine*, 16 T.C. 1035 (1951).

Respondent contends that the valuation arrived at under section 25.2512–5 is unreasonable and unrealistic in the light of the prior earnings record of the partnership and the actual earnings of the partnership and receipts of the trustee for the 5 years subsequent to the date of the gift. It is clear from the evidence and the figures that the prior earnings of the partnership were used in arriving at the stipulated value of the partnership on the date of the gift. The average annual net income of the partnership for the 5 years preceding the date of gift was approximately $200,000, and respondent's expert witness projected average annual income for the future to be $220,000 because of higher earnings in the years immediately preceding and following the date of the gift. $220,000 capitalized at 20 percent, which both parties agree is the proper rate, produces a value of $1,100,000. Presumably, all other factors prescribed in section 25.2512–3 for valuation of an interest in an unincorporated business were also taken into consideration in arriving at the stipulated value. So it is apparent that the relatively high earnings of the business have been taken into consideration in applying the method prescribed by section 25.2512–5. We are not convinced that actual earnings for the 5-year period after the date of gift, which may be considered only

to check the accuracy of the valuation determined from information available at the date of the gift, prove that the valuation arrived at by the prescribed method was so unreasonable as to make the prescribed method invalid or to require resort to some other method. If the 3½-percent interest or discount figure used in the table, which was prescribed by respondent, is unwarranted, respondent has failed to show us why or what more appropriate rate should be used.

Neither party attacks the validity of the regulations. Respondent simply claims that under the circumstances here present section 25.2512-3 should be used in valuing the interest transferred and that section 25.2512-3 requires consideration of all the valuation factors mentioned therein. For reasons stated above, we disagree that section 25.2512-3 rather than section 25.2512-5 is applicable here. But even if so, respondent's expert appears to have used only projected earnings, discounted, in arriving at his value of $316,000. Respondent's expert arrived at that value by estimating future average net earnings of the partnership to be $220,000 annually, providing an income of $74,800 annually for the 34-percent interest held by the trustee. He then applied a factor of 4.2261 to this so-called "stream of income" to arrive at a present value of the right to receive over a 10¼-year period an annual income of $74,800. Presumably, the factor used took into consideration a discount rate of 20 percent for risk as well as some factor for determining present worth of a right to receive a specified sum of money in the future.[6] Even if we accept this method of valuation, which is nowhere prescribed in respondent's regulations, and the figures used, without having much idea whether it is appropriate and they are correct, it appears to us that the method fails to take into consideration at least several circumstances here present which an investor having a reasonable knowledge of all relevant facts would take into consideration in determining the price he would be willing to pay for the property interest here involved.

Respondent's basic premise, in applying this method, is that the net partnership income, before taxes, will be $220,000 per year for the entire 10¼-year term of the trusts, and that 34 percent thereof, or $74,800 per year, will be available to the trustee each year. Possibly the risks of the business and the uncertainty that the earnings of the business would continue at a higher rate than the average past earnings for a period of 10¼ years, which extends beyond the life of the patent, are discounted by use of the 20-percent factor. But all the evidence points to the fact that it was very unlikely that all the earnings of the business would be available for distribution. As pointed out by

---

[6] Respondent's witness testified that he first worked out the factor himself and then checked it against Table IX, designated "Years Purchase Valuation Factors, Compound Interest Valuation Premises" appearing on page 235 of Principles of Valuation by J. A. Grimes and W. H. Craigue. No satisfactory explanation of the principles involved in this method of valuation was given.

petitioners' expert witness, if it is assumed that only 50 percent of earnings will be available for distribution annually, so that the remaining 50 percent would only be available to the beneficiaries at the termination of the trusts, the value of the gift would be reduced to $197,000 even using respondent's projections and method. It also seems to us that a prudent investor would take into consideration the income taxes he would have to pay as a partner before investing $316,000 of his tax-paid funds in the right to receive a possible total of $766,700 over a 10¼-year period. If his income tax bracket was 50 percent, he would have to have almost all of his share of the net income distributed to him annually in order to get his $316,000 of tax-paid investment back. This would leave very little for return on an admittedly risky venture—and he might possibly have to wait 10 years to get that if the "payout" was less than 100 percent. And, of course, if the "payout" was only 50 percent and, as a partner, he had to pay tax on his entire share of the partnership income at a 50-percent rate, he would receive only enough each year prior to final distribution to pay his taxes.

Based on all the evidence presented we are not convinced that the use of the method prescribed by section 25.2512–5(c) of the regulations for valuation of the 34-percent partnership interests transferred by petitioners in trust here is so unreasonable or unrealistic as to justify or require departure therefrom in this instance. Hence, we have found as a fact that the value of the interests transferred was a total of $111,000 as determined under that section of the regulations.

The second issue is whether Carl made a taxable gift to Beyer as a result of the sale to him in 1955 of a 2-percent interest in each of the Weller companies, including the partnership discussed above. Beyer paid a total of $36,950 for these interests. Carl's workpapers with respect to the Beyer sale allocate $11,618 of the total price to the 2-percent interest in the partnership, which appears to have been 2 percent of the book value of the partnership at that time. The parties have stipulated that the fair market value of the 2-percent interest in the partnership at the time of the sale was $22,000. Respondent contends that the difference between the $11,618 paid for this interest and the $22,000 fair market value was a taxable gift from Carl to Beyer.

Section 2512(b) of the Code provides that where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property transferred exceeds the consideration shall be deemed a gift. Respondent's regulations have long modified this rather ironclad approach of the Code. While providing in section 25.2512–8 of the regulations that sales of property may constitute gifts for gift tax purposes to the extent the value of the property exceeds the consideration received,

it is stated immediately thereafter: "However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth." The courts have given approval to respondent's regulations. See *Commissioner* v. *Wemyss*, 324 U.S. 303 (1945); *Estate of Monroe D. Anderson*, 8 T.C. 706 (1947). The parties are in accord that the question is whether this sale was a bona fide, arm's-length sale, at a freely negotiated price, without donative intent, in the ordinary course of business.

Very briefly, the evidence indicates that after Miller sold his interest in the partnership for approximately 1½ times book value, Carl made an effort to dispose of a 25-percent interest on about the same basis for the purpose of diversifying his investments and to obtain cash for personal use. He was unsuccessful in this effort. One of the persons he offered to sell to or through was Beyer. Beyer was not in a position to buy that large an interest but did evidence an interest in acquiring a much smaller interest. Beyer offered to pay book value for the 2-percent interest and, while Carl was not happy with this price, he did agree to sell Beyer a 2-percent interest in all the Weller companies for book value in order to get cash he wanted for personal use. There is no evidence, except the discrepancy between price and stipulated value, that either party felt he was giving or receiving any more than was necessary to consummate the transaction. Both Carl and Beyer testified it was an arm's-length transaction. Nor is there any evidence of any reason Carl would have for making a gift to Beyer. Beyer was not a natural object of Carl's bounty. While donative intent is not a requisite for a gift for tax purposes, *Commissioner* v. *Wemyss*, *supra*, the absence of donative intent is specifically made relevant under the regulations to the question whether the transfer was made in the ordinary course of business, and donative intent may be considered in determining generally whether a taxable gift has been made. *Eleanor A. Bradford*, 34 T.C. 1059 (1960).

Respondent contends that Carl's motive in selling the partnership interest to Beyer at less than its actual value was to establish a value for his and Emily's gifts of a 34-percent interest in the partnership transferred to the trusts on the same day; and that the price was therefore not fixed in an arm's-length business transaction. While it would appear somewhat anomalous that two knowledgeable and experienced businessmen, dealing at arm's length, would reach a price far below fair market value for the 2-percent interest, it must be remembered that the $22,000-fair-market-value figure was stipulated long after the transaction took place, it is higher than the relative price for which Miller had recently sold his interest in the partnership, Carl had been unable to sell any part of his interest for even

the Miller price in previous efforts, and the price was actually the book value of a 2-percent interest. It would also be somewhat unrealistic to believe that Carl would deliberately sell a 2-percent interest in his business to an outsider at half price in the hopes that it would fix the value of the much larger interest he was transferring to the trusts for gift tax purposes, particularly when the Miller sale of a more comparable interest had recently been consummated at a higher price and the sale price to Beyer was not specifically broken down between the various interests sold. We will not indulge in such speculation to override the affirmative evidence presented.

There is no evidence that Beyer or anyone else would have given Carl more at that time for the 2-percent interest sold. Perhaps Carl was too anxious to sell, or simply made a bad bargain, but if he did, such a result—if it proceeds from a genuine business transaction—does not lead to a taxable gift. See *William H. Gross*, 7 T.C. 837 (1946). More likely we merely see demonstrated herein how hypothetical may be the figure for, and how theoretical may be the concept of, "fair market value," in particular circumstances.

Petitioners have demonstrated error in respondent's determination that Carl made a taxable gift to Beyer, and we hold for petitioners on this issue.

The third and final issue is whether petitioners are entitled to the $3,000 annual exclusion allowed by section 2503 of the Code with respect to the gifts in trust to petitioners' minor children. Respondent allowed the claimed exclusions with respect to the gifts to the four adult beneficiaries but denied them with respect to the gifts to the minor beneficiaries on the ground that the gifts were of future interests specifically disallowed under section 2503(b).

The pertinent provisions of the trust instruments provide that the balance of the principal (after deducting the portions allocated to the adult beneficiaries) shall be divided into three equal shares, one for each of the minor children. If a child should die during the term of the trusts, the principal of that beneficiary's trust is to be distributed equally among the other trusts. Upon expiration of the term (10 years and 90 days) the entire principal of all trusts was to revert to the settlor or his or her estate.

The net income of each of the trusts for the adult beneficiaries is payable to the beneficiary at least annually. The net income of each of the trusts for the children is payable to the beneficiary, but it is further provided that if a minor becomes entitled to receive income, the trustee may retain and invest same and expend so much of the funds, as the trustee may deem proper, for the maintenance, support, and education of such minor. Any amounts not so required may be held by the trustee and invested, such accumulations to be paid

over to each beneficiary as he or she attains his or her majority. The trusts are irrevocable.

The minor beneficiaries were 14, 9, and 8 years old on the date of the gifts in trust.

Section 2503(b) of the Code [7] provides that the first $3,000 of any gift (other than gifts of future interests) made to any person during a calendar year shall be excluded from taxable gifts. Petitioners do not dispute that the gifts to the minors would be viewed as gifts of future interests under section 2503(b) apart from section 2503(c), but claim that the exclusions are allowable by virtue of section 2503(c). Section 2503(c) provides that no part of a gift to a minor shall be considered a gift of a future interests under section 2503(b) if "the property and the income therefrom" (1) may be expended by or for the benefit of the donee before he attains the age of 21 years, and (2) will to the extent not so expended (A) pass to the donee upon his attaining age 21, and (B) in the event the donee dies before attaining age 21, will be payable to his estate or his appointee.

On brief respondent relies on the argument that it is well established by a long line of decisions, including *Commissioner* v. *Disston*, 325 U.S. 442 (1945), that interests of this type are future interests within the meaning of section 2503(b) and that section 2503(c) is not applicable because the "property" (presumably the principal of the trusts—the 34-percent interest in Weller Manufacturing Company) reverts to the settlors and hence will not pass to the donees at age 21 or to their estates in the event they die before age 21. Respondent also argues that even if the income from the trusts is construed as "property" within the meaning of the section, petitioners are still not entitled to the benefits of the section because the trust agreements provide that in the event of death of a beneficiary his share "shall be distributed equally among the other trusts" whereas the statute requires distribution to the estate of the donee. Respondent does not elucidate on this latter argument.

---

[7] SEC. 2503(b). EXCLUSIONS FROM GIFTS.—In the case of gifts (other than gifts of future interests in property) made to any person by the donor during the calendar year 1955 and subsequent calendar years, the first $3,000 of such gifts to such person shall not, for purposes of subsection (a), be included in the total amount of gifts made during such year. * * *

(c) TRANSFER FOR THE BENEFIT OF MINOR.—No part of a gift to an individual who has not attained the age of 21 years on the date of such transfer shall be considered a gift of a future interest in property for purposes of subsection (b) if the property and the income therefrom—

(1) may be expended by, or for the benefit of, the donee before his attaining the age of 21 years, and

(2) will to the extent not so expended—

(A) pass to the donee on his attaining the age of 21 years, and

(B) in the event the donee dies before attaining the age of 21 years, be payable to the estate of the donee or as he may appoint under a general power of appointment as defined in section 2514(c).

It has been recognized by the Supreme Court that a gift may be separated into component parts, one of which may qualify as a present interest under the statute. *Fondren* v. *Commissioner*, 324 U.S. 18 (1945); *Commissioner* v. *Disston, supra*. This Court recently concluded in *Arlean I. Herr*, 35 T.C. 732 (1961), affd. 303 F. 2d 780 (C.A. 3, 1962), that in enacting section 2503(c), the provisions of which were new in the 1954 Code, Congress intended the word "property," as used therein, to mean "not the corpus of a trust, but rather the totality of elements that go to make up the entire gift that is being considered for classification as a present interest," and held, under circumstances similar to those present here, that the elements of the gift consisted of all the income up to majority. And in *Jacob Konner*, 35 T.C. 727 (1961), decided by this Court the same day, it was held that a gift to a minor of the right to receive income from a trust fund for slightly more than 10 years was a gift of a present interest even though the trust instrument provided that in the event of the donee's death prior to the end of the term, the trust would terminate and any income that would have been payable to the donee's trusts had she lived, from the time of her death to the end of the term, would be paid to a trust for the benefit of her surviving sister. It was held that the gift under consideration was the right to receive income during the term *or* until the donee's death prior to the end of the term, and that inasmuch as any accumulated income up to date of death was payable to donee's appointee or her estate the gift qualified as a gift of a present interest under section 2503(c). See also Rev. Rul. 58-242, 1958-1 C.B. 251.

The reasoning of the above cases applies with equal force to the facts of this case. The "property" given to the minor donees was the right to receive the income from the trusts for a term of 10 years and 90 days *or* until the prior death of the donee. Income during the term of the trust can be accumulated but is required to be paid over to the beneficiary as he or she attains majority. While the trust instruments do not specifically provide what shall be done with accumulated income in the event of the death of a beneficiary before reaching majority or at the end of the term, we think it was clearly the intention of the settlors that any accumulated income is to be distributed to the beneficiary upon termination of the trust and to his or her estate if he or she dies prior to termination of the trusts.[8] We think it is also clear that the provision relied on by respondent that in the event of death of a donee his share "shall be distributed equally among the other trusts" refers only to the corpus of the trusts and not to accumulated income. The provision referred to by respondent reads, in part, "the *principal* of the trust of which the deceased party was

---

[8] This conclusion finds support in Carl's testimony and in the letter written by Carl to the trustee under date of July 29, 1955, reproduced in our Findings of Fact.

a beneficiary shall be distributed equally among the other trusts." (Emphasis supplied.)

While the point is not argued by respondent we find nothing in the Pennsylvania law cited by petitioners which would require a conclusion that under the law of that State these trust instruments would be interpreted to give any income accumulated up to the time of the event to anyone other than the named donee of the particular trust or his estate either at the termination of the trust term or in the event of the death of the donee during the term of the trust and before reaching age 21. See Pa. Stat. Ann. tit. 20, secs. 301.6, 301.7 (1961); *In re Walters' Estate*, 223 Pa. 598, 72 Atl. 1062 (1909); *In re McKeown's Estate*, 384 Pa. 79, 119 A. 2d 76 (1956); *In re Wheelock's Estate*, 401 Pa. 193, 164 A. 2d 1 (1960). Cf. *Helvering* v. *McCormack*, 135 F. 2d 294 (C.A. 2, 1943).

It thus appears that the gifts to the minors in this case comply with all the requirements of section 2503(c) and are consequently not to be considered gifts of future interests under section 2503(b). It follows that the $3,000 annual exclusions are allowable with respect to the gifts to each of the three children. *Arlean I. Herr, supra; Jacob Konner, supra.*

*Decisions will be entered under Rule 50.*