LEONARD ROSEN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3200–65—3203–65.   Filed September 15, 1967.

*Jacquin D. Bierman,* for the petitioners.
*Robert E. Garfield,* for the respondent.

RAUM, *Judge:* The respondent determined deficiencies in gift tax for the calendar years 1961, 1962, and 1963 as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 3200–65 | Leonard Rosen | 1961 | $2,025.00 |
| | | 1962 | 2,187.00 |
| | | 1963 | 2,088.28 |
| 3201–65 | Dorothy Rosen | 1961 | 2,025.00 |
| | | 1962 | 2,187.00 |
| | | 1963 | 2,088.28 |
| 3202–65 | Julius J. Rosen | 1961 | 2,700.00 |
| | | 1962 | 2,844.00 |
| | | 1963 | 2,784.37 |
| 3203–65 | Claire A. Rosen | 1961 | 2,700.00 |
| | | 1962 | 2,844.00 |
| | | 1963 | 2,784.37 |

Dorothy is Leonard's wife and Claire is Julius' wife. Leonard and Julius are brothers. All four petitioners resided in Baltimore or Baltimore County, Md., when the petitions herein were filed. All four filed separate gift tax returns with the district director of internal revenue at Baltimore. The gifts in question were made by the husbands, and the wives are involved merely because each consented to have her husband's gifts treated as having been made one-half by herself. During each of the tax years each husband transferred certain shares of stock to trusts for the benefit of his children, and the sole question, common to all four cases, is whether petitioners were entitled to annual exclusions of $3,000 per donee under section 2503(b) of the Internal Revenue Code of 1954 with respect to these transfers of stock in 1961, 1962, and 1963.

The gifts consisted entirely of shares of stock in a corporation (Gulf American Land Corp.) controlled by the donors. Although the trusts in form provided for payment of income to the children-beneficiaries for specified periods of years, the corporation in fact had never paid

---

[1] Cases of the following petitioners are consolidated herewith: Dorothy Rosen, docket No. 3201–65; Julius J. Rosen, docket No. 3202–65; and Claire A. Rosen, docket No. 3203–65.

any dividends, nor did there appear to be any likelihood that any dividends would be received by the trusts in the reasonably near future or, for that matter, within any reasonably ascertainable fixed period; and the trusts have not in fact received any income up to the present time. The $3,000 exclusions claimed relate solely to these so-called income interests, and the question for decision is whether petitioners have established that there were *in fact* gifts of present interests in reasonably ascertainable amounts so as to qualify for the section 2503(b) exclusion. All of the facts have been stipulated, and will be summarized in greater detail below. The stipulations themselves are incorporated herein by reference as our findings.

FACTS

Leonard Rosen and his brother Julius J. Rosen were the prime organizers of Gulf Guaranty Land & Title Co., now Gulf American Land Corp. ("Gulf American"). They have been its two senior corporate officers throughout its existence since its organization in 1957, and have always owned substantially more than 50 percent of its stock. On September 14, 1961, Leonard transferred 21,000 shares of Gulf American common stock in trust, to be divided into three equal parts, for the benefit of each of his three children. On the same date, Julius transferred 24,000 shares of Gulf American stock in trust, to be divided into four equal parts, for the benefit of each of his four children. The trust agreements, also executed on September 14, 1961, were substantially identical in all respects herein material, except for the trustees and beneficiaries named therein and except for the periods during which the income was to be paid to each beneficiary prior to distribution of corpus.

The children and their respective birth dates were as follows:

*Children of Leonard Rosen*

| | |
|---|---|
| Linda Heyman | June 17, 1941 |
| Ronald Rosen | Aug. 8, 1943 |
| Sandy Rosen | Sept. 22, 1951 |

*Children of Julius J. Rosen*

| | |
|---|---|
| Edith Anne Rosen | July 30, 1953 |
| Amy Sue Rosen | Jan. 29, 1955 |
| Lisa Beth Rosen | Nov. 15, 1958 |
| Judy Ellen Rosen | Nov. 24, 1959 |

The trustees under Leonard Rosen's trust agreement were:

(1) Julius J. Rosen.

(2) Bernard H. Herzfeld, a personal friend and attorney for Leonard Rosen for many years. He is presently general counsel for Gulf American, and has been a member of its board of directors since its organization.

(3) Sylvia Sandler, sister of Leonard Rosen.

(4) Solomon Sandler, Sylvia's husband. He has been a director of Gulf American since 1958, and was a corporate officer of Gulf American and/or a subsidiary from later 1959 to 1965. He is now an executive of a corporate business not connected with Gulf American.

The trustees under Julius J. Rosen's trust agreement were:

(1) Leonard Rosen.

(2) George London, Julius J. Rosen's accountant for many years. At one time, George London was Treasurer of Gulf American and presently is a financial consultant to the corporation.

(3) Sylvia Sandler, sister of Julius J. Rosen.

(4) Paul Venze, a cousin of Julius J. Rosen. Paul Venze is primarily engaged in the advertising business.

The entire net income of each trust was stated to be payable to the named beneficiary no less frequently than annually. The corpus relating to each beneficiary in the Leonard Rosen trusts was to be distributed to such beneficiary in two installments upon attaining the age of 25 and 30, respectively, whereas the corpus in each of the Julius J. Rosen trusts was distributable in stated percentages in three installments to the respective beneficiary upon attaining the age of 25, 30, and 35. Provision was made for gifts over in both sets of trusts in the event of prior decease of a beneficiary.

In their respective 1961 gift tax returns Leonard and Julius each valued the Gulf American stock thus transferred by them at $17 a share.

On October 18, 1962, Leonard transferred an aggregate of 18,000 additional shares of Gulf American to the foregoing trusts created by him, and on the same day Julius transferred an additional 16,000 shares to the trusts which he had created for his own children. There had meanwhile been a 4 for 1 split of Gulf American shares of stock earlier in 1962, and the 1962 transfers were valued by Leonard and Julius in their respective 1962 gift tax returns at $4.67 a share.

On December 18, 1963, Leonard and Julius each made further transfers of Gulf American stock to their respective trusts in the aggregate amounts of 4,500 and 6,000 shares, respectively. These shares were valued at $4.125 each in the 1963 gift tax returns filed by Leonard and Julius.

With respect to each of the foregoing gifts by Leonard, his wife, petitioner Dorothy Rosen, made timely consents to have all of her husband's gifts treated as if made one-half by each spouse. Similarly, petitioner Claire A. Rosen, Julius' wife, made timely consents to have all of her husband's gifts treated as if made one-half by each spouse.

Gulf American Land Corp. was incorporated under the laws of the State of Florida in July, 1957, under the name Gulf Guaranty Land & Title Co. The company's principal business was and is the develop-

ment of large tracts of unimproved land into a planned community in which it offers for sale homesites, multiple-dwelling sites, and commercial and industrial lots. Through subsidiaries, the company has also engaged in the construction of houses, in the clearing and draining of land, the construction of roads and waterways, and the operation of a motel and restaurant. Beginning in 1957, and continuing through 1961, 1962, and 1963, the company's major project was the development of a large tract of land located on the southwest coast of Florida known as Cape Coral.

The company appears to have followed an aggressive policy of increasing its inventory of raw land for development and subdivision purposes. As of November 30, 1960, it owned 12,764 acres in fee in the Cape Coral area, and had options at the same time to purchase 15,541 additional acres contiguous to this property. It also acquired 26,250 acres of unimproved land near Naples, Fla. Its holdings have been increasing in substantial amounts since that time.

In early 1961, Gulf American offered its common stock, together with debentures convertible into its common stock, to the general public for the first time. In connection with this offering, Gulf American filed a prospectus, dated March 8, 1961, with the Securities and Exchange Commission containing, *inter alia*, the following statements, which the parties herein have stipulated to be true:

### SPECULATIVE NATURE OF THE OFFERING

Any person considering the purchase of the securities offered hereby should consider the following facts:

1. The future success of the Company will depend upon its ability to continue to develop and sell homesites on a profitable basis and there is no assurance that this can be done in the future.

2. It is the obligation of the Company to complete the development of roads, waterways and drainage canals on the properties in which it has made sales of residential homesites, multiple dwelling sites, and commercial and industrial sites. Rader and Associates, consulting engineers, of Miami, Florida, have been retained by the Company for engineering and city planning services and they have prepared a cost estimate as of August 31, 1960, for the development of Cape Coral * * * . The cost estimate indicates that the estimated cost of development of 11,844 acres at Cape Coral in which the Company had made sales at the time of the study on which the cost estimate was based would approximate $18,190,510, or an average of about $1,536 per acre. At August 31, 1960 the Company had spent $2,945,249 for development improvements consisting primarily of roads, waterways and drainage canals. Based on an average estimated cost of development of $1,536 per acre, Rader and Associates believe that an additional $15,245,261 will be required to complete the development of the 11,844 acres from which the Company had sold lots at August 31, 1960.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

4. In most cases only small cash down payments have been made on land sales, generally no investigation has been made of the credit standing of the purchasers, and installments under purchase contracts are generally payable

838

over periods ranging from four to ten years. Substantially all of the land contracts receivable of the Company are "installment" accounts.

The prospectus also specifically pointed out that the foregoing development costs (estimated at $1,536 per acre) did not include the installation of sewerage and water systems, and that while shallow well water supplies and septic tanks were satisfactory for the then relatively sparse occupancy of the land which was expected to continue for some months, centralized water and sewerage systems would ultimately be necessary. Although it noted an estimate of about $2,100 an acre to provide such facilities in the area from which it had made land sales, it stated that no reserve was set up in its financial statements therefor because of its expressed belief that it could recover the cost of these facilities "within a reasonable time" through operating revenues and charges made to users of the projected centralized water and sewerage systems.

Gulf American's corporate charter does not provide for cumulative voting for directors. Leonard Rosen and his brother Julius J. Rosen have always held more than a majority of the outstanding common stock of Gulf American (approximately two-thirds) which gives them sufficient voting power to elect the entire board of directors without proxies from any public shareholders. The following schedule sets forth the number of shares of common stock of Gulf American owned on certain dates (1) by Leonard Rosen, (2) by donees who received their shares through Leonard Rosen, (3) by Julius J. Rosen, (4) by donees who received their shares through Julius J. Rosen, and (5) the total number of shares of common stock of Gulf American which were issued and outstanding on those dates.

GULF AMERICAN LAND CORPORATION

SHARES OF COMMON STOCK OWNED BY VARIOUS INTERESTS

| Date | Leonard Rosen | Ronald Rosen (son of Leonard Rosen) | Sandy Rosen (daughter of Leonard Rosen) | Irrevocable trust for benefit of children of Leonard Rosen | Irrevocable trust for benefit of grand-children of Leonard Rosen | Julius J. Rosen | Irrevocable trust for benefit of children of Julius J. Rosen | Total shares out-standing |
|---|---|---|---|---|---|---|---|---|
| Aug. 31— | | | | | | | | |
| 1961 | [1] 789, 738 | | | | | 789, 738 | | 2, 257, 401 |
| | [2] 3, 158, 954 | | | | | 3, 158, 954 | | 9, 029, 604 |
| 1962 | 3, 072, 285 | 400 | 400 | 84, 000 | | 3, 057, 614 | 96, 000 | 9, 275, 581 |
| 1963 | 3, 050, 251 | 400 | 400 | 102, 000 | | 3, 036, 514 | 112, 000 | 9, 301, 403 |
| 1964 | 3, 039, 920 | 400 | 400 | 106, 500 | | 3, 026, 504 | 118, 000 | 9, 383, 919 |
| 1965 | 3, 032, 601 | 400 | 400 | 110, 100 | 20, 000 | 3, 000, 880 | 150, 800 | 9, 437, 251 |

[1] Before a 4 for 1 stock split effected through a 300% stock dividend on Feb. 19, 1962.
[2] Adjusted to reflect stock split.

The number of shares of common stock of Gulf American owned by persons (other than those shown on the schedule above) related to Leonard Rosen or Julius J. Rosen is not significant. Neither Leonard Rosen, Julius J. Rosen, nor the spouse of either has ever had any

significant ownership of options, warrants, or convertible debentures capable of conversion into common stock of Gulf American.

Among directors of Gulf American during the period from January 1, 1961, to December 31, 1965, were the following: Leonard Rosen, Julius J. Rosen, Solomon Sandler (brother-in-law of both Leonard and Julius J. Rosen and trustee under the Leonard Rosen trust agreement), Bernard Herzfeld (attorney of Leonard Rosen and trustee under the Leonard Rosen trust agreement), Cornelius McGillicuddy, Jr. (a vice president of Gulf American), David Bomstein (a certified public accountant, whose primary source of income was as a corporate officer of an unrelated business), and Paul Huddles (an executive of an unrelated business). Bomstein and Huddles were among the original investors who formed Gulf American Land Corp., and both own substantial blocs of stock. They were elected to the board of directors in 1960 to represent minority shareholders. Cornelius McGillicuddy, Jr., David Bomstein, and Paul Huddles had no family or social relationship with the Rosens.

In addition, the following served as directors of Gulf American for shorter periods of time:

George London (1961–1963), who served as Treasurer of Gulf American for several years, and who has been a financial consultant to the company since his resignation as an officer and director. George London was the accountant and personal friend of Julius J. Rosen, and served as trustee under the Julius J. Rosen trust agreement.

Charles F. Hall (1962–1965), a business executive who has no family, social or business relationship with petitioner. Mr. Hall has been Mayor of Dade County and a member of the County Board of Commissioners during this period.

Horace S. Miller (1963–1965), vice-president of Bankers Life and Casualty Company of Florida. Mr. Miller was added to the board of directors immediately following a loan by Bankers Life and Casualty Company to Gulf American and may be considered the lender's representative on the Board. He has no family, social or business relationship with the Rosens.

Chester Devenow (1965), a business executive having no family or business relationship with the Rosens.

James A. Farley, Jr. (1965), president of a New York bank, who has no family, social or business relationship with the Rosens.

John H. Weir (1963–1965), a business executive and director of several Florida banks, having no family, social or business relationship with the Rosens.

Milton N. Weir (1963–1965), an officer and director of several Florida banks, having no family, social or business relationship with the Rosens.

The parties have stipulated that each of the directors of Gulf American (other than the Rosens) acts in an independent capacity in determining dividend policy and does not act at the direction of either of the Rosens.

At least up to the date of the hearing in these cases (Jan. 16, 1967), Gulf American has never paid any dividends on its common stock.[2]

---

[2] The parties have stipulated that it paid no dividends since shares were sold to the public in early 1961, and other evidence in the record, particularly schedules showing earnings realized and retained at the end of each year, make clear that there have been no distributions of earnings since the organization of the corporation.

Its retained earnings on certain dates, together with the number of shares of common stock outstanding on those dates, were as follows:

| Date<br>Aug. 31— | Retained earnings | Total number of shares<br>outstanding |
|---|---|---|
| 1961 | $9, 640, 128 | 2, 257, 401 |
| 1962 | 15, 461, 480 | 9, 275, 581 |
| 1963 | 22, 027, 441 | 9, 301, 403 |
| 1964 | 32, 623, 018 | 9, 383, 919 |
| 1965 | 46, 065, 275 | 9, 437, 251 |

As a result of a 4 for 1 stock split, three additional shares were issued for each share outstanding to stockholders of record February 19, 1962, and as a consequence, capital stock was increased by $6,940,953 by transfers of $1,900,555 from capital contributed in excess of par value and $5,040,398 from retained earnings.

There were no legal restrictions affecting the declaration and/or payment of dividends prior to October 25, 1963. On that date, however, Gulf American and its wholly owned subsidiary, Surety Acceptance Corp., executed a loan agreement with Bankers Life & Casualty Co. Paragraph 7.3 provided that Gulf American could not:

(a) Declare or pay any dividend or make any other distributions on any shares of its capital stock (other than in shares of its capital stock), (b) make any payment on account of the purchase, redemption, acquisition or retirement of its capital stock or (c) make any prepayment, other than a required sinking fund payment, on any Indebtedness which by its terms is subordinate in right of payment to the Notes, unless the aggregate amount of such dividends, payments and prepayments in any fiscal year does not exceed the lesser of (1) 50% of the net income of the Company during the preceding fiscal year or (ii) 50% of the cash flow of the Company during the four fiscal quarters preceding the date of declaration or payment of such dividend or distribution or the date of such payment for the purchase, redemption, acquisition or retirement of its capital stock or the date of such prepayment.

The agreement also provided that:

"cash flow" for any period shall mean, on a consolidated basis (a) cash received from the following sources: (1) collections from customers comprising cash sales, down payments and other receipts from all contracts for land whether assigned or otherwise and whether relating to the Contract Area or otherwise, (2) rental and other miscellaneous income, (3) proceeds from sales of apartments, (4) proceeds from the sale of fixed assets and (5) proceeds from loans and the public or private placement of debt securities; less (b) cash disbursed for the following purposes: (1) selling, advertising and general and administrative expenses, (2) payments for land improvements, (3) mortgage payments (including interest) on land purchases, (4) deposits and down payments on land acquisitions, (5) payments of principal and interest on all outstanding debts, (6) payments for acquisition or construction of fixed assets, (7) refunds to customers on cancelled contracts, (8) repurchases of land previously sold to customers, (9) real estate and other taxes, (10) debenture sinking fund payments (when applicable), (11) Federal income taxes (when applicable) and (12) other miscellaneous operating expenses; plus (c) the amount of payments

in subdivisions (1), (2), (8), (9) and (12) of clause (b) above which were accrued on the consolidated balance sheet of the Company (as prepared in accordance with presently existing accounting methods used by the Company) as of the beginning of the period, and reduced by the amount of all accruals of such items at the end of the period.

At all material dates, the more serious of the two restrictions in paragraph 7.3 related to "cash flow." A computation of "cash flow" and dividend limitations on certain specific dates is as follows:

| Date | Cash flow | Dividend limitation |
|------|-----------|---------------------|
| Aug. 31, 1964 | $2, 880, 457 | $1, 440, 228 |
| Aug. 31, 1965 | None | None |
| Aug. 31, 1966 | None | None |
| Nov. 30, 1966 | 8, 715, 319 | 4, 357, 659 |

On December 14, 1965, at the request of Gulf American, the restriction on the amount of distributions was specifically waived by the creditor.

The public shareholders of Gulf American consistently inquired at annual meetings as to the date when the company would initiate dividend payments, but were told only that management continuously reviews cash flow and budgets for the purpose of determining whether dividends would be in the best interest of the company. In a request for a revenue ruling submitted to respondent on June 9, 1965, on behalf of Gulf American, Leonard Rosen, and Julius J. Rosen, it was stated that the board of directors had concluded that the initiation of regular quarterly dividends would improve the corporation's public image, reward stockholders, improve the investment prestige of the company's stock, and facilitate the raising of further capital and the securing of financing. However, since the cash flow of Gulf American would not permit the regular payment of dividends in any meaningful amount on all of the approximately 9,400,000 shares then outstanding, a request was made for a ruling as to the tax effects of a waiver by Leonard Rosen and Julius J. Rosen on prospective cash dividends on the approximately 6 million shares of common stock held by them, but with a specific number of their shares to become free of waivers each quarter over a period of time. The proposed agreement between the Rosens and Gulf American would expire after 6 years and all shares would thereafter be free of dividend waivers.

No such agreement between the Rosens and Gulf American was ever in fact effected, and no dividends were ever paid under the above plan. When the tax representative of the Rosens discussed the plan with personnel of the Internal Revenue Service, Tax Rulings Division, they indicated to him their concern with the fact that a substantial number of Gulf American shares were held by trusts for close relatives of the Rosens, by a foundation created by the Rosens, and by officers, directors, and employees of Gulf American, that these shares would

be free of any dividend waivers, that the waiver agreement might be considered an attempt to shift dividends from Leonard and Julius J. Rosen to related persons, and that a ruling might be issued under which the Rosens would remain the parties subject to tax on part of the dividends. The tax representative of the Rosens subsequently suggested to them that the trustees under the trust agreements of September 14, 1961, agree to the same waiver of dividends as the Rosens, but the attorney for the trustees advised that this would be a breach of fiduciary duty, and Leonard Rosen informed his tax representative that he and his brother would not take any steps which would damage the trusts—that the trusts were not to be treated "any different than any other trust would be treated." A revised proposal was sent to the Internal Revenue Service, but this was ultimately withdrawn, and no ruling, favorable or unfavorable, was ever issued by the Internal Revenue Service.

Common stock of Gulf American Land Corp. has been listed on the American Stock Exchange since June 1961, and on the Pacific Coast Stock Exchange since June 1962. The shares of common stock of Gulf American transferred by the Rosens under the trust agreements of September 14, 1961, have never been subject to any contractual provisions limiting the trustees' power to sell, exchange, or otherwise dispose of the shares. However, the trustees would be required to file a registration statement with the Securities and Exchange Commission upon their disposition of the shares of Gulf American, unless (1) the shares were sold in a private sale to a purchaser taking the shares for investment, or (2) limited sales were made through brokers in ordinary transactions on a national stock exchange. Under regulations promulgated by the Securities and Exchange Commission, sales are considered limited if not in excess of the weekly trading volume on any exchange during any week in the 4 weeks preceding the sale. The average number of Gulf American shares traded weekly on the American Stock Exchange each year from 1961 through 1966 was as follows:

| Year | Average number of shares traded per week |
|---|---|
| 1961 [1] | 64,438 |
| 1962 [2] | 91,679 |
| 1963 | 29,950 |
| 1964 | 21,757 |
| 1965 | 43,315 |
| 1966 | 38,186 |

[1] Trading began last week in June 1961.
[2] A 300% stock dividend to effectuate a 4 for 1 split was distributed in March 1962.

The maximum number of shares which can be sold through brokers' transactions during any consecutive 6-month period is subject to the

further limitation of 1 percent of the total number of shares issued and outstanding in that period.

The trustees under the trust agreements of September 14, 1961, were given broad powers in respect of holding or selling any property received by them, or reinvesting proceeds in any securities or property, whether or not income-producing. In this connection the trust agreements provided that the trustees were given the following power:

(a) To hold and continue to hold as an investment the property received hereunder, and any additional property which may be received by them, so long as they deem proper, and to invest and reinvest in any securities or property, whether or not income-producing, deemed by them to be for the best interest of the trusts and the beneficiaries hereunder, without being limited to trust or chancery investments provided by law, * * *

Notwithstanding the foregoing power to dispose of the Gulf American stock and to reinvest the proceeds in income-producing property or securities, it was the deliberate policy of the trustees to retain the non-income-producing Gulf American stock. In respect of the attitude of the trustees towards the retention of the Gulf American stock the parties have stipulated as follows:

The trustees under the agreement of September 14, 1961, of whom two have been directors of Gulf American, felt themselves to be in a particularly favorable position to judge the expected future action of Gulf American with respect to dividend policy and to judge the potential for appreciation in value of Gulf American common stock. In the view of the trustees the probability of future dividends in substantial amounts was sufficient to warrant retention of stock, notwithstanding the absence of current income. Furthermore, in the opinion of the trustees, the market price for Gulf American stock considerably underestimated the value of present and future earnings of the corporation, so that a sale of Gulf American stock would not be economically beneficial. It was the specific belief of the trustees that retention of Gulf American stock would furnish greater overall benefits to the beneficiaries than would an immediate sale and investment of the proceeds in then currently income-producing property.

Each petitioner originally claimed on his or her gift tax return for the years 1961, 1962, and 1963, annual exclusions equal to $3,000 times the number of beneficiaries of the trust to which the gift was made. Thus, Leonard and Dorothy Rosen each claimed $9,000, and Julius J. and Claire A. Rosen each claimed $12,000 per year in exclusions for all 3 years in issue. These exclusions related entirely to the so-called income interests of each beneficiary, which were assumed to have a value in excess of $3,000 each. In this Court, petitioners undertake to support their claim to exclusions in the amount of $3,000 for each beneficiary for each of the years 1961 and 1962, but they claim exclusions in lesser amounts for 1963. They base their present position upon the ground that the gifts of the so-called income interests in 1961 and 1962 had a value of more than $3,000 each, but they

concede that the gifts of such interests in 1963 had a value of less than $3,000 with the consequence that they now seek exclusions for 1963 only in the amount of such alleged lesser values. Their present position is based upon a computation of value for each so-called income interest by applying the actuarial factors taken from table I, column 3 of section 25.2512–5(f) of the Gift Tax Regulations. These actuarial factors reflect the present worth of a life estate in property yielding income at a rate of 3½ percent. The computations thus submitted by petitioners are as follows:

### LEONARD ROSEN AND DOROTHY ROSEN

| Beneficiary | Date of Birth | Age at date of gift | | |
|---|---|---|---|---|
| | | *9/14/61* | *10/18/62* | *12/18/63* |
| Linda | 6/17/41 | 20 | 21 | 22 |
| Ronald | 8/ 8/43 | 18 | 19 | 20 |
| Sandy | 9/22/51 | 10 | 11 | 12 |

### ACTUARIAL COMPUTATION

| *1961* | Actuarial factor [1] | Total gift [2] | Value of income interest |
|---|---|---|---|
| 20 | 0. 78813 | $59, 500 | In excess of |
| 18 | . 79979 | 59, 500 | $3, 000 per |
| 10 | . 84135 | 59, 500 | donee. |
| | | 178, 500 | |
| *1962* | | | |
| 21 | . 78203 | 14, 250 | In excess of |
| 19 | . 79404 | 14, 250 | $3, 000 per |
| 11 | . 83653 | 14, 250 | donee. |
| | | 42, 750 | |
| *1963* | | | |
| 22 | . 77576 | 3, 187. 50 | $2, 472. 74 |
| 20 | . 78813 | 3, 187. 50 | 2, 512. 16 |
| 12 | . 83160 | 3, 187. 50 | 2, 650. 73 |
| | | 9, 562. 50 | 7, 635. 63 |

### JULIUS J. ROSEN AND CLAIRE A. ROSEN

| Beneficiary | Date of Birth | Age at date of gift | | |
|---|---|---|---|---|
| | | *9/14/61* | *10/18/62* | *12/18/63* |
| Edith Ann | 7/30/53 | 8 | 9 | 10 |
| Amy Sue | 11/29/55 | 6 | 7 | 8 |
| Lisa | 11/15/58 | 3 | 4 | 5 |
| Judy | 11/24/59 | 2 | 3 | 4 |

## ACTUARIAL COMPUTATION

| 1961 | Actuarial factor [1] | Total gift [2] | Value of income interest |
|---|---|---|---|
| 8 | 0. 85044 | $51, 000 | In excess of |
| 6 | . 85864 | 51, 000 | $3, 000.00 |
| 3 | . 86886 | 51, 000 | per donee. |
| 2 | . 87122 | 51, 000 | |
| | | 204, 000 | |
| *1962* | | | |
| 9 | . 84600 | 9, 500 | In excess of |
| 7 | . 85466 | 9, 500 | $3, 000. 00 |
| 4 | . 86582 | 9, 500 | per donee. |
| 3 | . 86886 | 9, 500 | |
| | | 38, 000 | |
| *1963* | | | |
| 10 | . 84135 | 3, 187. 50 | $2, 681. 80 |
| 8 | . 85044 | 3, 187. 50 | 2, 710. 78 |
| 5 | . 86237 | 3, 187. 50 | 2, 748. 80 |
| 4 | . 86582 | 3, 187. 50 | 2, 759. 80 |
| | | 12, 750. 00 | 10, 901. 18 |

[1] From table I, col. 3, Gift Tax Regs. sec. 25.2512-5(f).

[2] After reduction by one-half for gift splitting between husband and wife under sec. 2513.

### OPINION

Section 2503(b) of the 1954 Code provides that the first $3,000 of gifts to any person during a calendar year shall not be included in the total amount of gifts made during such year.[3] Such exclusion, however, is explicitly limited to gifts "other than gifts of future interests in property," or, in other words, is applicable only to present interests. Thus, the rights of the beneficiaries herein to distribution of corpus at specified ages, even though vested, are future interests "limited to commence in use, possession or enjoyment at some future date or time," *Commissioner* v. *Disston*, 325 U.S. 442, 446. Accordingly, no exclusion is available with respect to any such interest in the corpus of these gifts, and petitioners claim none. They do contend, however, that the income interests spelled out in the trust agreements constitute present interests, and that exclusions are allowable in respect thereof.

[3] SEC. 2503. TAXABLE GIFTS.

(b) EXCLUSIONS FROM GIFTS.—In the case of gifts (other than gifts of future interests in property) made to any person by the donor during the calendar year 1955 and subsequent calendar years, the first $3,000 of such gifts to such person shall not, for purposes of subsection (a), be included in the total amount of gifts made during such year. Where there has been a transfer to any person of a present interest in property, the possibility that such interest may be diminished by the exercise of a power shall be disregarded in applying this subsection, if no part of such interest will at any time pass to any other person.

To be sure, an income interest in property, particularly one involving a current and steady flow of income, may qualify as a present interest, and the donor is entitled to an exclusion up to $3,000 of its value. But it may well be questioned whether even an income interest is properly classifiable as a present interest where no income is in fact being paid currently and where none is expected to be paid at least for some years yet to come. Surely, a gift of income to commence, say, 5 or 10 years from the date of gift is hardly a gift of a present interest. And it is at least arguable that a gift of income which is not being paid currently and which in fact is not likely to be paid within the reasonably foreseeable future is similarly a gift of a future interest, notwithstanding that it is phrased in terms that suggest a present interest. However, the Government has not challenged the exclusions herein on the ground that the gifts failed to qualify as present interests. Rather, it takes the position that the so-called income interests in this case are not susceptible of valuation and that the exclusions are unavailable for that reason. We think it is correct in this contention and that the exclusions must be denied.

It is settled law that "Since the statutory exclusion * * * applies to the first $3,000 of a gift to each beneficiary, it is axiomatic that the interests transferred must have a determinable value." *Fischer* v. *Commissioner*, 288 F. 2d 574, 577 (C.A. 3), affirming a Memorandum Opinion of this Court. This rule has been recognized on a number of occasions, and it has been held in a variety of situations that "a gift of a present interest has not qualified for an annual exclusion where the value of the interest was not reasonably certain." *Fischer* v. *Commissioner, supra* at 577. Cf. *Elise McK. Morgan*, 42 T.C. 1080, affirmed 353 F. 2d 209 (C.A. 4), certiorari denied 384 U.S. 918; *Funkhouser's Trusts* v. *Commissioner*, 275 F. 2d 245 (C.A. 4); *LaFortune* v. *Commissioner*, 263 F. 2d 186 (C.A. 10); *Herrmann's Estate* v. *Commissioner*, 235 F. 2d 440, 444–445 (C.A. 5); *Evans* v. *Commissioner*, 198 F. 2d 435 ('C.A. 3); *Commissioner* v. *Brandegee*, 123 F. 2d 58, 61 (C.A. 1); *Vogel* v. *United States*, 42 F. Supp. 103, 105 (D. Mass.); *Margaret A. C. Riter*, 3 T.C. 301, 303; *Andrew Geller*, 9 T.C. 484, 494–495.

The principle thus recognized or given effect in the foregoing cases applies with particular force in the present case. Petitioners, of course, have the burden of proof, *Fischer* v. *Commissioner, supra* at 577, and they have relied solely upon the actuarial tables in the regulations which are predicated upon a steady flow of income at the rate of 3½ percent per year. Apart from the fact that they have relied upon the wrong tables—i.e., they based their computations upon tables involving income interests that continue throughout the *life* of the beneficiary rather than upon the tables involving income interests payable over a

fixed *term* of years [4]—the use of the tables is wholly inappropriate in this case. The record fails to establish any factual base that would support any valuation of the so-called income interests or that would justify use of the tables.

The gifts consisted solely of Gulf American stock. No dividends had ever been paid upon that stock up to the times the gifts were made, none were paid during the tax years 1961–63, and none have been paid since then. Although the trustees had the power to sell the stock and reinvest the proceeds in income-producing property or securities, there is no evidence that they had any intention of doing so at the times the gifts were made, cf. *Hanley* v. *United States*, 63 F. Supp. 73, 82 (Ct. Cl.), nor is there the slightest indication that the donors intended them to do so. To the contrary, every inference in the record suggests that the trustees intended to and were expected to continue to hold the non-income-producing Gulf American stock, and the trust instruments explicitly authorized the trustees to retain the stock received by them.[5]

Nor is there any convincing evidence that the Gulf American stock itself would yield any income within any reasonably determinable period after the gifts or in any reasonably determinable amount. It must be remembered that Gulf American had been incorporated only some 4 years before the first (and largest) gifts to the trusts, that it was engaged in a highly speculative venture, that large expenditures were required in the future for such purposes as drainage and central water and sewerage systems, that its cash resources depended primarily upon the small downpayments and installments received from purchasers of its lots, and that although its books appeared to disclose comparatively large earnings, such earnings in fact represented more of an accounting concept than liquid assets available for dividends. The record fails to show that Gulf American was in a position to pay dividends at the time of the gifts or that it would be in such position within a reasonably ascertainable future period. The evidence in respect of the abortive attempt in 1965 to obtain a ruling that would enable Gulf American to pay dividends on a selective basis is at best inconclusive, and, if anything, demonstrates that the corporation was not then able to pay dividends to its stockholders on a nondiscriminatory basis. Moreover, the record strongly indicates that Gulf American

---

[4] None of the so-called income interests herein were life estates. Each was to terminate upon the beneficiary's attaining a specified age. And if petitioners had used the tables for terms of years (which were similarly based upon a flow of income at the annual rate of 3½ percent), the resulting valuations would have been lower than those upon which they rely.

[5] *Gilmore* v. *Commissioner*, 213 F. 2d 520 (C.A. 6), relied upon by petitioners, is not controlling here, or, at best, is inconclusive with respect to the issue before us. The issue there was whether the gift was one of a future interest, not whether it was susceptible of valuation ; and the question to which the court directed itself in this connection was whether the trustees' power to invest in non-income-producing property required the classification of the gift as a future interest. It did not appear to give any consideration to whether the subject of the original gift was non-income-producing, and it is clear that it did not deal with the question whether the gift was reasonably susceptible of valuation.

848

was pursuing an aggressive program of expansion, and as new large tracts of raw land were being acquired, even greater expenditures would be needed for their development, thus postponing to the even more remote future the time when it would have cash available for the payment of dividends.

Taking the entire record into account, and even without giving any special consideration to the severe limitations upon Gulf American's right to pay dividends during the years 1963–65 as a result of a loan agreement, we are fully satisfied that it was not possible to make any reasonable valuation of the so-called income interests in question. At the times of the gifts and for any reasonably determinable future period they were as illusory as a million-dollar bequest in a pauper's will.

In these circumstances, the use of the tables, which are based upon an assumed annual yield of 3½ percent, is entirely inappropriate and unacceptable. *Elise McK. Morgan, supra,* 42 T.C. at 1088. Cf. *Huntington National Bank,* 13 T.C. 760, 769–772; *Hanley* v. *United States,* 63 F. Supp. 73, 80–82 (Ct. Cl.); Rev. Rul. 66–307, 1966–2 C.B. 429. While it is true that the tables are in general applicable, it has been recognized, *Carl E. Weller,* 38 T.C. 790, 803, that they will not be used as a basis for valuation where the result would be "unrealistic and unreasonable." In the present case, the result of employing the tables would be "unrealistic and unreasonable," since they would produce a clearly erroneous valuation for that which in fact has no value or which may have a value that is so uncertain as to be incapable of reasonable ascertainment. Petitioners have failed to establish a reasonably ascertainable value for the so-called income interests, and resort to the tables in the circumstances of this case is no substitute for such failure.

*Decisions will be entered for the respondent.*