JOHN H. VERNON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MARY E. VERNON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4496-74, 4497-74.    Filed June 17, 1976.

*Drew R. Tillotson* and *John H. McGarvey,* for the petitioners.
*Edward J. Roepsch,* for the respondent.

WILES, *Judge:* Respondent determined gift tax deficiencies for the calendar quarter ending December of 1971 of $998.47 for John H. Vernon and $2,015.36 for Mary E. Vernon. The issue is whether, in valuing the gift in issue, the valuation method contained in section 25.2512-9(a)(1)(i) and (e), Gift Tax Regs., should be used or whether another valuation method is more acceptable.

## FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

Petitioners, husband and wife, lived in Vail, Colo., when they filed their petitions herein. Petitioners filed gift tax returns for the calendar quarter ending December 1971, with the Internal Revenue Service Center, Midwest Region, Kansas City, Mo. On those returns, petitioners consented to have any gifts made by them to third parties during such calendar quarter considered as having been made one-half by each of them. John H. Vernon is a party herein because he consented to this gift splitting. Accordingly, "petitioner" hereinafter will refer to Mary E. Vernon.

On December 31, 1971, petitioner and Central National Bank & Trust Co., Des Moines, Iowa, entered into a trust agreement, which provided in part:

### ARTICLE II

The Trustee shall collect, receive, receipt for, and manage the principal and income of the Trust Estate, and after paying the proper charges and expenses of the Trust, the Trustee shall pay to or for the benefit of ETHEL F. METCALFE all of the current net income of the Trust Estate, in annual or more frequent installments.

### ARTICLE III

The term "net income" as used in this Agreement shall mean net income for Federal income tax purposes as determined by the provisions of the Internal Revenue Code of the United States from time to time in effect; however, "net income" shall not include any gain or loss resulting from the sale or exchange of a capital asset.

### ARTICLE IV

Upon the death of ETHEL F. METCALFE, or at the expiration of ten (10) years from the date of this Agreement, whichever event shall first occur, this Trust shall terminate and (a) the Trustee shall distribute to ETHEL F. METCALFE, if living, and if not, to her estate, all the undistributed current

net income not previously distributed pursuant to the provisions of Article II, and (b) the Trustee shall distribute the principal of the Trust Estate to the Trustor, if living, and if not to her estate.

### ARTICLE V

This Agreement and trust herein created is irrevocable during the trust period. The Trustor shall have no power to amend, modify or alter in any way the provisions of this Agreement.

### ARTICLE VI

Ths [sic] Trustee shall have power and authority to do any act or thing reasonably necessary or advisable for the proper administration and distribution of each trust created by this instrument, and shall have all powers, duties and responsibilities provided expressly for trustees by the Iowa Probate Code. In extension but not in limitation of any power, right or discretion otherwise possessed by the Trustee, the Trustor grants to it, without the necessity of notice to or approval of any court or person, the following powers:

1. To sell, exchange, borrow, mortgage, lease, or otherwise dispose of any asset for terms within or extending beyond the term of the trust.

\* \* \*

3. To acquire, invest, exchange, retain, sell, and manage trust assets, exercising the judgment and care under the circumstances then prevailing, which men of prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital. Within the limitations of that standard the Trustee is authorized to acquire and retain every kind of investment, specifically including, but not by way of limitation, bonds, debentures, and other corporate obligations, and stocks, preferred or common, which men of prudence, discretion, and intelligence acquire or retain for their own account.

4. To retain cash or other assets, expressly including shares of stock of Younkers Brothers, Inc., whether or not of the kind herein authorized for so long as it deems advisable.

\* \* \*

### ARTICLE X

This Agreement has been executed and delivered in the State of Iowa and all questions of law arising under this Agreement shall be determined under and according to the laws of the State of Iowa.

Ethel F. Metcalfe, the sole net income beneficiary, is petitioner's mother. On December 31, 1971, she was 67 years old, based upon her nearest birthday to December 31, 1971.

Pursuant to the trust agreement, petitioner transferred 9,600 shares of the common stock of Younker Bros., Inc. (hereinafter Younkers), to Central National Bank & Trust Co. as trustee. The shares had a value of $28 per share on December 31, 1971, for a total of $268,800. Younkers is a publicly owned Delaware

corporation. Its common stock is traded "over the counter" and as of December 31, 1971, there were no restrictions on its transfer or on who could hold it. On December 31, 1971, neither petitioner nor her husband controlled the operation of Younkers either directly or indirectly.

The following dividends were paid on Younkers common stock from January 1, 1965, through January 1, 1972:

| Date payable | Amount | Date payable | Amount | Date payable | Amount |
|---|---|---|---|---|---|
| 1/1/65 | .40 | 7/1/67 | .26¼ | 1/1/70 | .30 |
| 4/1/65 | .30 | 10/1/67 | .26¼ | 4/1/70 | .32½ |
| 6/10/65 | .30 | 1/1/68 | .30 | 7/1/70 | .32½ |
| 9/10/65 | .30 | 4/1/68 | .30 | 10/1/70 | .32½ |
| 1/1/66 | .30 | 7/1/68 | .30 | 1/1/71 | .32½ |
| 4/1/66 | .30 | 10/1/68 | .30 | 4/1/71 | .35 |
| 7/1/66 | .35 | 1/1/69 | .30 | 7/1/71 | .26¼ |
| 10/1/66 | .26¼ | 4/1/69 | .30 | 10/1/71 | .26¼ |
| 1/1/67 | .26¼ | 7/1/69 | .30 | 1/1/72 | .26¼ |
| 4/1/67 | .26¼ | 10/1/69 | .30 | | |

Younkers common stock split 4 shares for 3 on February 23, 1965, August 23, 1966, and June 1, 1971.

The outstanding number of shares of Younkers common stock and the approximate unrestricted amounts of retained earnings available for future dividend distributions to Younkers common shareholders were as follows from 1965 through 1972:

| FYE Jan. 31— | Approximate unrestricted retained earnings | Common shares outstanding |
|---|---|---|
| 1965 | $3,600,000 | 618,798 |
| 1966 | 5,200,000 | 825,064 |
| 1967 | 6,900,000 | 1,100,086 |
| 1968 | 8,600,000 | 1,096,356 |
| 1969 | 5,975,000 | 1,096,356 |
| 1970 | 10,792,000 | 1,196,356 |
| 1971 | 12,351,000 | 1,181,356 |
| 1972 | 14,302,000 | 1,575,808 |

Petitioner's father was a Younkers executive for many years. He died in 1940, when petitioner was 3 weeks old. Petitioner's mother and sole beneficiary of the trust involved herein was the sole beneficiary under the will of petitioner's father. Because petitioner was not included in her father's will, she inherited two-thirds of her father's estate as an afterborn child. This estate consisted primarily of Younkers stock. From 1940 to the time of

trial, petitioner owned the inherited Younkers stock.[1] The one-third interest in the Younkers stock which petitioner's mother inherited was not sufficient to support her. Petitioner felt that the Younkers stock should not have been hers originally and by creating the 1971 trust sought to provide her mother with the financial independence she believed her father would have wanted. The trustee's representatives knew that petitioner wanted ultimately to retain the Younkers stock, since it had belonged to her father, unless there were terrific changes in economic conditions. The parties have stipulated that the value of the gift in question, for gift tax purposes, as computed under section 25.2512-9(a)(1)(i) and (e), Gift Tax Regs., was $104,338.48.

OPINION

Petitioner transferred 9,600 shares of Younker Bros., Inc., common stock to a trust. Her mother, Ethel F. Metcalfe, was the sole income beneficiary. Upon Ethel F. Metcalfe's death or the expiration of 10 years, whichever occurred earlier, the trust was to terminate, and petitioner was to receive the trust principal. The ultimate issue is the determination, for gift tax purposes, of the value of petitioner's gift to the trust.

In computing the value of the gift, respondent relies upon section 25.2512-9(a)(1)(i) and (e), Gift Tax Regs. Section 25.2512-9(a)(1)(i) provides that "Where the donor transfers property in trust or otherwise and retains an interest therein, the value of the gift is the value of the property transferred *less the value of the donor's retained interest.*" (Emphasis added.) Section 25.2512-9(e) provides the method for valuing the retained interest. That method employs an annual interest rate of 6 percent. If we should decide that the gift is to be valued according to the method in the regulations, the parties have stipulated that its value was $104,338.48.

Petitioner contends that respondent's computation of the value of the gift fails to recognize the specific situation involved herein. In essence, she wants to determine the value of the gift by computing the present value of the right to receive net income from the trust (rather than subtracting the value of the retained

---

[1] In 1961, petitioner placed 2,700 shares of Younkers common stock in a trust similar to that involved herein. She had, however, a reversionary interest.

interest from the value of the property transferred). In calculating the assumed income earned each year, she further contends that the annual interest rate should be 3.75 percent instead of 6 percent.

Section 2512(a)[2] states that if a gift is made, "the value thereof at the date of the gift shall be considered the amount of the gift." However, nowhere does the Internal Revenue Code define "value" for gift tax purposes or provide the procedure for determining value. Instead, the law grants respondent authority to promulgate regulations to implement the tax laws. Sec. 7805(a). In *Carl E. Weller,* 38 T.C. 790, 803 (1962), this Court stated that the method prescribed in the regulations must be followed, "unless it is shown that the result is so unrealistic and unreasonable that either some modification in the prescribed method should be made * * * or complete departure from the method should be taken, and a more reasonable and realistic means of determining value is available."

Petitioner has not proved that the result based upon the regulations is unrealistic and unreasonable or that her method is more reasonable and realistic. We accordingly hold for respondent.

To support her first contention, that she may determine the value of the gift by computing the present value of the right to receive net income from the trust, petitioner cites *Carl E. Weller, supra* at 802 n.5:

Paragraph (d) provides that to determine the value of a reversionary interest after a term of years, column 4 of Table II is to be used. The figures in column 4 of Table II are the corollary of the figures in column 3 so whether the value of the reversionary interest is first determined from column 4 and deducted from the value of the entire interest to arrive at the value of the term of years or whether the value of the term of years is determined by applying the figures in column 3 directly to the value of the property transferred, the result is the same.

Based upon this footnote, she concludes that there are two equally acceptable methods of valuing gifts: (1) Valuing the income interest directly, which she calls the "Column 3" approach and which she seeks to employ, or (2) subtracting the value of the retained interest from the value of the transferred property, the "Column 4" approach, which is required by section 25.2512-9(a)(1)(i), Gift Tax Regs.

---

[2] Statutory references are to the Internal Revenue Code of 1954, as amended.

It is true that in *Weller* taxpayers valued the income interest directly. It is equally true that the value of the gift was the same whether the income interest was valued directly or whether the value of the retained interest was subtracted from the value of the transferred property. But it is not true that *Weller* stands for the proposition that either method is equally acceptable in all cases. In *Weller* the parties apparently did not dispute whether the income interest was to be valued directly or whether the retained interest was to be subtracted from the value of the transferred property. In the case before us, however, they do, and when one of the parties urges strict adherence to the method contained in the regulations, it must be used, since those regulations are presumptively correct, unless another method is shown superior. It is administratively convenient, at the least, to have one method which is presumptively correct rather than two methods which are equally acceptable.

To support her second contention, that she may use an annual interest rate of 3.75 percent rather than 6 percent, petitioner offers a schedule of prior cash dividends paid on the transferred stock. This schedule covers a 7-year period, from the first day of 1965 to the first day of 1972. Petitioner computes the average dividend as 3.75 percent and uses this yield in calculating the value of the assumed income earned each year, rather than respondent's yield of 6 percent. Petitioner's figure is inadequate for a number of reasons.

First, petitioner's yield is not a fixed yield but an average for 7 years. In reality, the yield fluctuated during the 7 years, as shown in the Findings of Fact. Accordingly, petitioner's contention that she could reasonably anticipate no substantial variation in the dividend pattern has little support.

Second, Younkers in 1971 had considerable unrestricted retained earnings available for future dividend distribution.

Third, the trustee had the power to sell trust assets and acquire other income-producing property. If the trustee sold the Younkers stock, the replacement assets might produce a different income yield. Petitioner contends, nevertheless, that the trustee's power is irrelevant since she made clear to the trustee's representatives that she did not want the Younkers stock sold unless there were "terrific changes in economic conditions." She cites *Fred A. Berzon,* 63 T.C. 601, 618 (1975), affd. 534 F.2d 528 (2d Cir. 1976), in which this Court stated "there is no indication in

the record that they [trustees] intended to do so [sell trust assets] or that they would in fact reinvest in income-producing property." *Berzon* is distinguishable for the fiduciary relationships in that case were far different from those in the case before us. As just stated, there was no indication that the *Berzon* trustees intended to sell the trust assets. In addition, their ability to do so was apparently limited severely by the terms of a stockholders' agreement, to which the trust indentures were subservient. To put it succinctly, the chances of sale of trust assets in *Berzon* were practically nil. In the case before us, however, the trustee was obligated under Article VI, paragraph 3 of the trust agreement to invest prudently. Clearly, the trustee had a fiduciary duty to sell the Younkers stock, if it deemed it advisable to do so, notwithstanding the private wishes of petitioner. Furthermore, petitioner could conceivably die during the term of the trust, in which case her wishes would have no further effect whatever. *Berzon* is therefore not applicable herein since the factual situation is far different.

Admittedly, there may be capital gain if the trustee sells the Younkers stock. Petitioner contends that this would further restrain the trustee from selling. Capital gain or not, if the trustee thought it was prudent to sell the Younkers stock, it would be under a fiduciary duty to do so.

Petitioner cites *Stark v. United States,* 477 F.2d 131 (8th Cir. 1973), affg. 345 F. Supp. 1263 (W.D.Mo. 1972), to support her position. For two reasons this case affords petitioner no support. First, the issue was different than in the case before us. The issue was whether, barring other evidence of value, the actuarial tables contained in the regulations could alone provide a value for certain gift interests. In the case before us, there is clearly other evidence of value; the issue is how to determine that precise value. Second, such general statements as are made in *Stark* about the application of the regulations in no way contradict the rule in *Weller.*

Petitioner cites a number of other cases, *Hamm v. Commissioner,* 325 F.2d 934 (8th Cir. 1963), affg. on other grounds a Memorandum Opinion of this Court *Hanley v. United States,* 105 Ct. Cl. 638, 63 F. Supp. 73 (1945); *Fred A. Berzon, supra; Leonard Rosen,* 48 T.C. 834 (1967), revd. 397 F.2d 245 (4th Cir. 1968); *Elise McK. Morgan,* 42 T.C. 1080 (1964), affd. 353 F.2d 209 (4th Cir. 1965), cert. denied 384 U.S. 918 (1966); *Hipp v.*

*United States,* 215 F. Supp. 222 (W.D.S.C. 1962), but, for either or both of the reasons above, in reference to *Stark,* they provide her no support.

*Decisions will be entered for the respondent.*