ESTATE OF IRMA E. GREEN, JOHN W. GREEN, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 40080.    Filed June 30, 1954.

*David Stock, Esq.*, for the petitioner.
*George E. Grimball, Jr., Esq.*, for the respondent.

OPINION.

FISHER, *Judge:* The question before us is whether or not, in the valuation of two remainder interests by the general method employed in section 81.10 (*i*) of Regulations 105, the discount factor of 4 per cent compounded annually, provided for in the regulations, should, upon the facts, be increased, and if so, by how much.

All of the facts are stipulated and are incorporated herein by reference except in the following respects: Paragraphs 18 and 19 of the stipulation refer to the value of the corpus of the trusts in question "at the death of the decedent." Petitioner's brief states that this was an inadvertent error of the parties, and adds that the estate tax return was filed on the optional basis and the determinations of value in the notice of deficiency were on the optional valuation date. The record confirms petitioner's statement, and no objection thereto is made in respondent's brief. We, therefore, give effect to the corrections suggested by petitioner.

Since our opinion will require a careful analysis of the facts, our summary of findings is necessarily in some detail.

Decedent, a resident of New York, was the vested remainderman of two trusts created by the will of her father, who also died a New York resident. The respective life beneficiaries were Josie and Hennie Rosenthal. The decedent died prior to the death of either life beneficiary and before coming into possession or enjoyment of either of her remainder interests.

All of the income of the trusts was currently distributable to the life beneficiaries.

At the death of decedent, Josie Rosenthal was 75 years of age and Hennie Rosenthal was 60 years of age.

At the death of decedent and on the optional valuation date, the principal of the Josie Rosenthal trust consisted of 300 shares of the common stock of the Ruberoid Company, and the principal of the Hennie Rosenthal trust consisted of 600 shares of the common stock of the same company. The principal of each trust has at all times consisted of common stock of the Ruberoid Company, or its predecessor. The company is engaged in the business of manufacturing asphalt and asbestos building materials.

The stock of the Ruberoid Company, of which there were 397,806 shares outstanding in 1948, was at all times material to this case listed on the New York Stock Exchange.

The annual earnings, dividends, price range of said stock, mean average sales price of said stock, and percentage yield on said average price, were as follows for the years 1939 to 1952, inclusive:

| Year | Earnings per share | Cash dividends per share | Price range of stock | Mean average sales price of stock | Yield on average sales price |
|---|---|---|---|---|---|
| 1939 | $1.53 | $1.10 | 15⅝–34 | 24⅞ | $4.43 |
| 1940 | 2.02 | 1.30 | 11⅝–22⅛ | 16¾ | 7.77 |
| 1941 | 3.93 | 1.75 | 14¾–21 | 17¾ | 9.87 |
| 1942 | 2.48 | 1.15 | 16–21½ | 18¾ | 6.14 |
| 1943 | 2.04 | 1.15 | 20½–28 | 24¼ | 4.74 |
| 1944 | 2.08 | 1.25 | 25–34⅞ | 30 | 4.17 |
| 1945 | 2.07 | 1.25 | 33–48 | 40½ | 3.09 |
| 1946 | 6.73 | 2.00 | 40½–65 | 52¾ | 3.79 |
| 1947 | 10.88 | 2.75 | 42½–68¼ | 55½ | 4.96 |
| 1948 | 11.80 | 3.25 | 54–72 | 63 | 5.17 |
| 1949 | 8.72 | 3.25 | 39⅝–61½ | 50½ | 6.44 |
| 1950 | 9.64 | 3.50 | 39⅞–55⅜ | 48⅛ | 7.28 |
| 1951 | 6.88 | 3.50 | 47½–63 | 55¼ | 6.33 |
| 1952 | 6.73 | 3.50 | 54–65½ | 59¾ | 5.86 |

In addition to the cash dividends set forth above, the following stock dividends were paid on the stock in the years indicated: 1948, 10 per cent; 1949, 10 per cent; 1950, 5 per cent; 1951, 5 per cent; 1952, 5 per cent.

The per share book value of the stock for the years indicated below was as follows: 1939, $38.24; 1940, $39.02; 1941, $41.30; 1942, $43.30; 1943, $45.44; 1944, $46.57; 1945, $47.32; 1946, $53.02; 1947, $62.47; 1948, $65.42; 1949, $65.64; 1950, $66.10; 1951, $64.38.

The earned surplus of the Ruberoid Company was as follows at December 31 of each of the following years:

| Year | Earned surplus | Year | Earned surplus |
|---|---|---|---|
| 1923 | $1,014,873 | 1950 | $13,998,252 |
| 1947 | 9,774,419 | 1951 | 14,755,559 |
| 1948 | 11,340,532 | 1952 | 15,893,061 |
| 1949 | 12,903,953 | | |

The value of the corpus of the Josie Rosenthal trust on the optional valuation date was $17,925, being the value of 300 shares of the Ruberoid Company stock, at $59.75 per share. The respondent has determined the value of the decedent's remainder interest in this trust to be $13,847.24, obtained by applying to the corpus the factor .77251 as prescribed in section 81.10 (*i*) of Regulations 105, which is based upon a 4 per cent discount factor, compounded annually.

The value of the corpus of the Hennie Rosenthal trust on the optional valuation date was $35,850 being the value of 600 shares of the Ruberoid Company stock, at $59.75 per share. The respondent has determined the value of the decedent's remainder interest in this trust to be $21,489.57, obtained by applying to the corpus the factor .59943 as prescribed in section 81.10 (*i*) of Regulations 105, which is based upon a 4 per cent discount factor, compounded annually.

In determining the deficiency, respondent has valued the remainder interests here involved by the use of the method provided by section 81.10 (*i*) of Regulations 105 for computing the present worth of a sum, the possession of which is deferred for a given period. The regulations adopt the combined experience table of mortality for determining the life expectancy of the life tenant which is the period during which the remainderman's possession will be deferred. The value of the corpus is then discounted at a rate of 4 per cent compounded annually over that period in order to ascertain the present worth.

Since it is a frequent practice (used by petitioner in his calculations in this case) to determine first the value of the life estate, and arrive at the value of the remainder interest by deducting the value of the life estate from the value of the corpus, we point out, for convenience in relation to our later discussion, that the regulations may just as easily be applied to that approach, because, instead of a discount factor, the regulation would merely apply the corresponding income or interest factor of 4 per cent compounded annually.

In the present case, the value of the corpus is stipulated, and no issue is raised as to the mortality tables. Petitioner urges, however, that the discount factor (for the purpose of direct valuation of the remainder interest) or the interest factor (if the approach is to value the life interest as the first step) should be substantially in excess of 4 per cent compounded annually for the purpose of valuing the remainders in this case.

Since the problem is identical in principle as to both remainders, our discussion will treat the matter as a single issue.

While our ultimate objective is limited to the valuation of the remainder interests, the fundamental problem is one of allocation between life tenant and remainderman. Convenience of discussion in relation to arguments advanced by the parties will require us, at times, to refer to the valuation of the life interests as one stage in the allocation of value as between such life interests and the remainder interests. We think this will be apparent in all instances from the context, and, of course, reference to the interest factor will relate to the life interests while the corresponding discount factor will relate to the remainders.

Petitioner urges that the 4 per cent discount factor is not necessarily the proper rate to be applied in all cases, and that, if the facts warrant, we may adopt a rate, either higher or lower, which is appropriate to the circumstances of the particular case. *Huntington National Bank*, 13 T. C. 760; *Security-First Nat. Bank of Los Angeles, Executor*, 35 B. T. A. 815; *William Korn, et al., Executors*, 35 B. T. A. 1071; *Hanley* v. *United States*, 63 F. Supp. 73. Respondent does not question this in principle.

On the other hand, of course, petitioner has the burden of overcoming the presumptive correctness of respondent's determination. *Estate of Abraham Koshland*, 11 T. C. 904, affd. (C. A. 9) 177 F. 2d 851, 853. We must keep in mind the fact that the valuation of life and remainder interests presents a difficult problem, seldom, if ever, to be answered with exactness or precision. From the administrative perspective, and in the interests of the convenience of taxpayers, a technique of general application, which is practical and workable and usually effects results which are broadly equitable, is to be encouraged. It is inherent in the very nature of the problem that a determination of the discount factor on the facts of each individual case would result in a variation from 4 per cent to some degree (however slight) in almost every instance. In this connection, it should also be kept in mind that an adjustment of the factor which may be highly significant in the resulting tax liability when applied to a very substantial corpus value may be *de minimis* when applied to a corpus in a lesser amount. Its significance may also vary with the circumstances of the life probabilities of the life tenant. If we were to hold that each variation, irrespective of practical significance, necessarily requires a separate calculation, we would, by the same token, require a precise measurement of the extent of the adjustment, in itself an impossible task in many instances. We would, at the same time, impose upon Commissioner and taxpayer alike, a difficult and costly burden, frequently unnecessary and impractical. To avoid introducing unnecessary complexity and confusion into this broad and active field, we take the view that the method prescribed in the regulations is to be followed unless the facts present a substantial reason for departure therefrom. See *McMurtry* v. *Commissioner*, 203 F. 2d 659, 666, 667.

The question of whether we should depart from the regulations and adjust the discount factor in the instant case is not free from doubt upon the facts before us. We find it necessary to divide our discussion into an evaluation of the following: (a) The facts available up to and including the valuation date; (b) the effect, if any, of stock dividends; (c) the effect, if any, of the facts subsequent to the valuation date; and (d) the effect, if any, of the speculative character of the assets of the trusts. In some respects, our discussion of the foregoing elements will overlap, but we will adhere to the above approach in the main.

(a) *Facts available up to and including valuation date.*

The corpus consisted solely of common stock of the Ruberoid Company. In arguing that the value of the life interests be increased, with a corresponding decrease in the value of the remainders, petitioner asserts that the average yield from the stock was substantially

in excess of 4 per cent. Disregarding at this point the factor of stock dividends, we find that the average cash dividend per share for the years 1944 to 1948, inclusive, gave an average yield on mean average selling price for the same years of 4.34 per cent. It is true that the earnings of the company for the same period were substantially in excess of the dividends, but the life tenants could receive only the dividends. It is also true that the cash dividends were increased in 1946, 1947, and 1948. As of the valuation date, we would be safe in assuming, for valuation purposes, that the average yield on average selling price would continue to be as high as the average above set forth, but unless we ourselves were to speculate, we could hardly assume, as of that date, a still higher future average yield, or measure how much higher that yield might be on the basis of the then available information as disclosed by the record.

We thus come to the question of whether, under the circumstances of the present case, an assumed yield of 4.34 per cent, as compared with 4 per cent as provided for in the regulations, is sufficient, of itself, to require us to depart from an established administrative method of determination. To reach a conclusion, we must apply our own judgment in the light of all of the circumstances. We must also face the fact that if we answer in the affirmative, we narrow to a marked degree the effective scope of what has generally proved to be a serviceable administrative method of dealing with a myriad of valuation problems.

We may add, at this point, that petitioner urges, upon the whole record, that the discount factor should be at least 10 per cent. If this contention were justified in fact, we would have no hesitancy in allowing an appropriate adjustment.

Limiting ourselves at the moment to a consideration of the facts available in this case as of the valuation date (and deferring our discussion of the stock dividend declared sometime in 1948) we hold that petitioner has not, on the strength of such facts, furnished us with a sufficient basis for departing from the provisions of the regulations.

(b) The effect, if any, of stock dividends.

In urging a discount factor substantially in excess of 4 per cent, petitioner emphasizes that stock dividends were declared as follows: 10 per cent in each of the years 1948 and 1949, and 5 per cent in each of the years 1950, 1951, and 1952. The stipulation of facts does not disclose whether the stock dividend for 1948 was declared before or after the valuation date (November 15, 1948) but we will assume for the purpose of our discussion that it was declared at a time sufficiently close to the valuation date to be given consideration for whatever it may be worth. . All of the other stock dividends were declared in later

years, and will be mentioned further in our discussion under (c), *infra*.

The date of death of the decedent under whose will the trusts were created was March 22, 1924. Petitioner cites *Matter of Osborne*, 209 N. Y. 450, and *Postley's Will*, 251 App. Div. 469, in support of the view that stock dividends received by New York trusts created prior to May 17, 1926, constitute income to the extent that they are distributed from earned surplus accumulated since the creation of the trust. Petitioner points out that decedent's will creating the trusts contained no provision concerning stock dividends. Petitioner also asserts that the stipulation of facts demonstrates that each of said stock dividends was distributed from the company's surplus earned after the death of the testator. We doubt whether, upon the record in the instant case, the authorities so cited may be applied here to the effect which petitioner urges. In view of the conclusion reached herein, however, we find it unnecessary to determine whether or not petitioner's contention on the law is correct, and we will assume, *arguendo* that the stock dividends were distributable to the life beneficiaries.

We therefore come to the question of whether, for the purposes of this case, the stock dividends furnish any basis for a measurable increase in the value of the life interests and corresponding reduction in the value of the remainders.

Our answer is in the negative. The stipulation of facts shows that there were no stock dividends during the years 1939 to 1947, inclusive. There is nothing in the record to show that, as of the valuation date, the company had established any policy of declaring regular stock dividends. We find no basis for an assumption that they would be so declared in the instant case. Particularly, we find nothing on the basis of which we could measure or calculate an appropriate increase in the value of the life interests or a corresponding decrease in value of the remainder interests.

We hold, therefore, that the declaration of a stock dividend in 1948 (and stock dividends in subsequent years) furnishes us no basis for determining how much, if at all, the discount factor should be adjusted, or the value of the remainder interests decreased in relation thereto.

(c) The effect, if any, of facts subsequent to the valuation date.

Petitioner further urges that we increase the discount factor in the light of the increase in earnings, dividends, and average yield for the years 1949 to 1952, inclusive, all subsequent to the valuation date and year. Petitioner also points to declarations of stock dividends for these years, although they dropped from 10 per cent to 5 per cent in the years 1950 to 1952, inclusive.

We do not agree with petitioner's contention. To accept it would, in effect, transpose the valuation date from 1948 to 1952, and would lead merely to the truism that if the facts as of the valuation date were different, the application of the facts would differ accordingly.

We do not, of course, imply that we would refuse to give consideration to circumstances occurring in the same setting, and having a clear relationship to conditions as of the valuation date, such as an arm's length sale of an asset within a reasonable time after the date as of which it was to be valued. Such an approach, however, differs widely from petitioner's contention.

(d) The effect, if any, of the "speculative character" of the trust assets.

The sole assets of the trusts consisted of common stock of the Ruberoid Company. The stipulation of facts discloses substantial fluctuations in the selling price of the stock from 1939 to 1952, inclusive.

Petitioner, on the basis of fluctuations in selling price, characterizes the stock as "speculative," and urges that we reflect this circumstance by a reduction of the values of the remainder interests.

It is true that, in *Security-First Nat. Bank of Los Angeles, Executor*, *supra*, in the preamble to the determination of the discount factor, the following language was used (p. 822): "Considering the whole record, including the speculative character of some of the securities * * *."

We do not doubt that, where securities are speculative, such speculative character is an element in the determination of their value. We must point out, however, that in order to adjust for such an element, there must be some foundation on which its effect on value may be *measured* within reasonable limits. In *Security-First Nat. Bank of Los Angeles, Executor*, *supra*, there was a mass of expert testimony from which a reasonable basis of measurement may well have been gleaned, although the Opinion does not describe such basis or segregate its effect on value. In the instant case, the record is bare of expert testimony, and presents nothing on the basis of which we might make a reasoned assessment of the effect of the speculative character of the stock upon the value of the remainder interest. No doubt the speculative element was reflected in the stipulated value of the stock itself (and in its market price) but we are not thereby aided in segregating value between life interest and remainder.

We find, therefore, a lack of proof of any basis for measuring the effect of the speculative character of the stock on the value of the remainder interest.

For completeness, we discuss a further argument, in this instance presented by respondent, urging us not to depart from the regulations on the theory that the future investments of the trust were indeterminate because the executors (as such, or acting as trustees) could have reinvested the trust corpus in assets other than common stock of the Ruberoid Company.

The assets of the trusts in question at all times (apparently for more than 20 years) consisted of common stock of the Ruberoid Company or its predecessor. The will expressly authorized the fiduciaries to retain existing investments without liability for loss resulting from such retention. There is nothing in the record to indicate that a change of investment was contemplated. It is true, nevertheless, that while the powers of investment were in some respects limited, they were broad enough to permit the executors (trustees) wide flexibility for reinvestment purposes, including investment in "dividend paying stocks of any corporation, provided the beneficiary for whom such share may be held in trust shall consent to such investment."

It is our view, upon the record, that considered in the light of the actual adminstration of the trusts for a substantial length of time, the reinvestment of the trust corpus in assets other than Ruberoid stock was unlikely, although the possibility of such reinvestment undoubtedly existed. We think, however, that we need to go no further in this case than to say that, in holding for the respondent, we find it unnecessary to rely upon the contention which we have just considered.

---

It follows from our discussion that we find no substantial reason upon the record for adjusting the discount factor which was applied by respondent in accordance with the applicable regulation. We are inclined to the belief that analysis of petitioner's several contentions emphasizes the practical advantages to Commissioner and taxpayer alike of an equitable, workable technique of general application for use in allocating value as between life beneficiary and remainderman. There also emerges some indication of the burdens inherent in any attempt to arrive at a tailormade per case determination. Special circumstances may dictate the necessity of the tailormade approach in particular cases, but it is our view that they are not present in the instant case.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, concurring: The petitioner seems to misconceive the purpose of the 4 per cent factor. It is to reduce to present worth a future payment, the amount of which has been determined by other

means. The evidence discussed in this case does not relate to the propriety of the 4 per cent factor and does not show, or tend to show, that 4 per cent does not properly take into account the risks and uncertainties which inhere in that problem. Rather the evidence relates to the value of the stock, or to the amount which may be expected at the future date, but the value of the stock has been settled by stipulation of the parties.

ARUNDELL, TURNER, and RAUM, *JJ.*, agree with this concurring opinion.