Estate of Leslie Evan Roberts, Deceased, Peggy Roberts, Executrix v. Commissioner.
Estate of Roberts v. Commissioner
Docket No. 592-66
United States Tax Court
T.C. Memo 1969-10; 1969 Tax Ct. Memo LEXIS 287; 28 T.C.M. (CCH) 40; T.C.M. (RIA) 69010; January 14, 1969, Filed *287 1. In February 1961 Seagrave Corp. and L. E. Roberts, deceased, entered into an employment contract. Seagrave agreed unconditionally to pay Roberts $614.50 semi-monthly, or $1,229 a month, beginning May 16, 1961, until May 1, 1971. Roberts died August 27, 1961. Seagrave was unconditionally other beneficiaries, or his estate. There remained to be paid 233 semi-monthly payments totaling $143,178.50 as of the date of death. The valuation date for determining the present value of the remaining contract payments is August 28, 1962. Held: The fair market value of the payments on the valuation date was $121,576.78. 2. Held: The value of several items of personal property and household effects was $4,775 on the valuation date. Leo Brady, 100 E. 42nd St., New York, N. Y. and Arthur L. Goldberg, 50 Broadway, New York, N. Y., for the petitioner. John K. Antholis, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined a deficiency in estate tax in the amount of $4,039.86. There are two issues: (1) Whether the fair market value on the valuation date, August 28, 1962, of 233 payments to be made by Seagrave, under an employment contract, was *288 $121,576.78, as determined by the respondent, or $85,900 as claimed by the petitioner. (2) Whether the fair market value on August 28, 1962, of several art and decorative objects was $8,275, as determined by the respondent, or $4,775 as reported and claimed by the petitioner. The parties have stipulated that an additional deduction from the gross estate of $1,500 is allowable for a debt of the estate, to be given effect under a Rule 50 computation. 41 Findings of Fact The stipulated facts are found as stipulated. The stipulations are incorporated herein by reference. The estate tax return was filed with the district director of internal revenue for the Manhattan District in New York City on November 27, 1962. Leslie Evan Roberts, the decedent, died testate, a resident of New York City, on August 27, 1961. He was survived by his wife, Peggy Roberts, and four children. Peggy Roberts, the petitioner, is the executrix of his estate. The decedent was born October 26, 1906. He was about 54 years old when he died. Issue 1: Employment Contract between Seagrave Corporation and the decedent: The decedent, referred to as Roberts, was an executive-consultant to Seagrave Corporation at the time *289 of his death. He had been employed by Seagrave since August 15, 1959, and prior thereto, under written employment contracts. As of February 14, 1961, Roberts was chairman of the board of directors and a member of the executive committee of Seagrave. For many years prior to 1950, Seagrave was engaged in the business of manufacturing and selling fire engines. In the late 1950's Seagrave undertook to diversify its business interests, and in 1961 it entered into negotiations to acquire several companies engaged in the business of tanning leathers. On February 14, 1961, Seagrave and Roberts entered into a new employment agreement which made provisions for (1) the nature of Roberts' services to the company from January 19, 1961, to May 15, 1961; (2) for the monthly amount of his salary; and (3) for unconditional payments by Seagrave for the period of May 16, 1961, to May 1, 1971, a period of 120 months, during which time Roberts was not obliged to devote all of his time to Seagrave, but would render such advisory and consulting services as might be requested, and such as he would be able to perform. The contract provided, inter alia, that in the event of the incapacity or death of Roberts, *290 Seagrave would be obligated to make the contract payments to him, or his widow, or to his designated beneficiaries, or to his estate, for the remainder of the period up to May 1, 1971. The contract of February 14, 1961, is incorporated herein by reference, and is referred to hereinafter. Following the death of Roberts, Seagrave continuously made the required contract payments to the estate of Roberts, which in turn paid them to his widow, Peggy Roberts. The material provisions of the contract are as follows: 1. It was agreed that Roberts' further services to Seagrave would end on May 15, 1961, instead of on August 14, 1964, which constituted an amendment of the prior employment contract of August 15, 1959, and that his salary would be $2,458.34 per month, payable semi-monthly, until May 15, 1961. The services of Roberts during this period were reduced to part-time, within New York City, and were to relate to such matters as he would be able to attend to, as an executive, and to such matters as the board of directors might assign to him. It was agreed that Roberts would complete his term as a member of the board of directors but would not seek a new term on the board. 2. It was agreed, *291 further, that beginning on May 16, 1961, Seagrave would pay Roberts $1,229 per month, for 120 months, in semi-monthly payments of $614.50, or 240 semi-monthly payments ending May 1, 1971, in the total sum of $147,480. It was agreed, also, that during the period of 120 months, or 10 years, Roberts would render only such part-time services in New York City, as an adviser and consultant, as the board of directors might assign to him, and as he might be able to render, and that he would not be required to devote all of his time to Seagrave. 3. It was agreed that for the purposes of the contract, Roberts' participation in the Seagrave Corporation's pension plan would end on May 15, 1961, but that Roberts would then become entitled to receive certain benefits which might have accrued to him under certain conditions. Additional material clauses of the contract are as follows, the paragraph numbers being the same as in the contract: * * * 3. Commencing on May 16, 1961 Seagrave shall pay semi-monthly to Roberts the sum of $1,229 per month for a period of 120 months, absolutely, unconditionally, and without diminution, offset, counterclaim or cross claim (except as such diminution, offset, *292 counterclaim or cross claim shall first be established by final judgment, if any, in favor of Seagrave against Roberts, by a court of competent jurisdiction), in lieu of the period of 144 42 months provided for in paragraph 4 of the agreement dated August 15, 1959. 4. If Roberts dies or is disabled or incapacitated during the term of this agreement, Seagrave shall continue to make the aforesaid semi-monthly payments to him or his widow, or other designated beneficiaries or his estate for the remainder of the period. * * * 7. Roberts will not, as long as he is receiving the payments required to be made to him pursuant to this agreement, directly or indirectly enter into or engage in any business which shall be competitive with the business of Seagrave as the same is presently constituted, or in which Seagrave may hereafter engage unless Roberts shall have engaged in such business prior to Seagrave. 8. If Seagrave shall at any time be merged or consolidated into or with any other corporation or if a substantial part of its assets are transferred to another person, company, firm or corporation, the provisions of this agreement shall be binding upon and inure to the benefit of the corporation *293 resulting from such merger or consolidation or to the persons, company, firm or corporation to which such assets shall be transferred, and this provision shall apply in the event of any subsequent merger, consolidation or transfer. * * * 12. This Agreement shall be binding upon the heirs, executors, successors and assigns of the parties hereto. No modification or amendment hereof shall be binding or no waivers effective unless in writing. Roberts received 7 semi-monthly payments of $614.50, each, up to the time of his death on August 27, 1961, in the total amount of $4,301.50. Upon his death, there remained to be paid 233 semi-monthly payments of $614.50, each, aggregating the total sum of $143,178.50 during a period of 9 years, 8 1/2 months until May 1, 1971. The parties are agreed that the value of the 233 payments under the contract, as of the valuation date, August 28, 1962, is includable in the value of the gross estate of the decedent. The executrix of the estate, upon filing the estate tax return, elected to have the assets of the estate valued as of the alternative valuation date, August 28, 1962, one year later than the date of death, August 27, 1961. The Seagrave Corporation, *294 for the years 1956-1966, inclusive, had net sales, net income, and earnings per share as shown in the following schedule, which also shows dividends paid, current assets and liabilities, and the high and low market prices of its common stock. Earnings
Price Per
Net [1]
Net [1]
Per
Dividends
Common
Current [1]
Year
Sales
Income
Share
Paid
High
Low
Assets
Liabs.
1956
6.55
0.14
0.35
[2] 0.10 3/4
8 3/4
4 3/4
3.07
0.79
1957
8.01
0.22
0.42
0.29 3/4
6 1/2
3 1/4
4.00
1.18
1958
7.27
0.08
0.14
0.04 2
6 3/8
3 1/2
4.03
0.82
1959
8.59
0.15
0.28
[2] 0.04 1/4
10 3/4
5 1/2
4.30
1.09
1960
11.17
0.22
0.48
[2]
8 1/4
5 1/4
5.22
1.74
1961
13.59
0.31
0.52
[2]
13 7/8
6 3/4
6.15
2.09
[3] 14.00
[3] 4.30
1962
36.80
1.23
1.55
[2]
13 5/8
6 7/8
16.05
4.40
1963
33.39
1.02
1.25
[6] *295 0.12 1/4
16 1/2
8 1/2
15.72
3.78
1964
35.86
1.65
2.01
0.15
15
9
18.69
5.85
1965
48.14
2.12
2.61
0.30
22 1/4
14 1/2
23.33
9.77
1966
58.54
[4] 1.42
[5] 1.71
[6] 0.40
27 3/8
14
25.10
11.25
The total assets of Seagrave Corporation increased from $9,000,000 in 1961, to $24,000,000 in 1962; and its liabilities increased from $1,700,000 in 1961, to $11,900,000 in 1962. Thereis no evidence here about what was the average yield from all obligations of Seagrave Corporation as of the date of the decedent's death, or for a representative period prior to, or subsequent to, the date of decedent's death. In the estate tax return, the petitioner reported $101,637.84 as the fair market value, as of August 28, 1962, of the 43 Seagrave contract dated February 14, 1961, under which the remainder of the payments to be paid by Seagrave were 233 semimonthly payments of $614.50, each, or total payments of $143,178.50. The respondent determined that the fair market value of the Seagrave contract, as of the date of the decedent's death, and also as of the alternative valuation date, is $121,576.78. The respondent made his determination on the basis of the factors set forth in section 20.2031-7(f), and Table II thereof, of the respondent's Estate Tax Regulations, which include (a) the number of the *296 payments which remained to be paid under the contract; (b) the amounts of the payments to be paid; and (c) the interval of payments. There is no question about the accuracy of the respondent's computations under the formulae and factors set forth in the regulation, or about the correct application by the respondent of the formulae and factors set forth in the regulation. There is no evidence here which would require that the fair market value of the Seagrave contract, as determined by the respondent, as of the date of the decedent's death, $121,576.78, should be changed to another value as of the alternative valuation date, August 28, 1962, because of factors or contingencies which came into existence during the period beginning August 27, 1961, and ending August 28, 1962, the alternate valuation date; and which factors or contingencies were due to reasons other than the mere losses of time. Issue 2: Value of Items of Personal Property of the Decedent: At the time of death, the decedent owned 24 pictures painted in oils and watercolors, a drawing, two Chinese porcelain vases, and two figures in Meissen porcelain. The petitioner reported, in the estate tax return, that the total fair *297 market value of those items was $4,775, on the alternative valuation date. None of the items was sold or disposed of within one year after the decedent's death. Respondent determined that $8,275 was the total fair market value of all of the items as of the alternate valuation date. Ultimate Findings of Fact 1. The fair market value of the Seagrave contract, as of the date of decedent's death, and as adjusted for factors (other than those due to the mere lapse of time) as of the alternate valuation date, August 28, 1962, was $121,576.78. 2. The total fair market value of the 24 paintings, the drawing, the two Chinese vases, and the two Meissen figures, as of August 28, 1962, was $4,775. 3. The parties have stipulated that there should be allowed a deduction of $1,500 for an indebtedness of the estate of the decedent to the brokerage firm, Hill, Darlington & Grimm. Opinion Issue 1 The question is to determine for estate tax purposes the fair market value on the valuation date of the Seagrave contract with the decedent. In the estate tax return, the petitioner reported that the value was $101,637.84. The respondent determined that the fair market value for estate tax purposes is $121,576.78. *298 The petitioner now contends that the value is $85,900, and no more. The respondent's determination is prima facie correct. The petitioner had the burden of proving error in respondent's determination. Welch v. Helvering, 290 U.S. 111 (1933. Petitioner relies upon the testimony of two witnesses who expressed opinions about the valuation of the contract. The opinion of one witness is that the fair market value is $70,000. The opinion of the other witness is that the fair market value is $85,900. A third witness, a loan officer of a bank, testified about the alleged lack of value of the contract as collateral for a bank loan. The respondent argues that the opinions expressed by petitioner's witnesses were totally incompetent because none had any knowledge about the valuation of a noncommercial annuity contract, or about actuarial tables, and because none had ever purchased or sold a contract similar to the one involved here. Respondent contends, in particular, that the witness,X, who expressed the opinion that the fair market value of the contract is $85,900, was not qualified as an expert to value the employment contract between Seagrave and the decedent. For convenience, this witness *299 is referred to hereinafter as "X". Respondent contends the petitioner failed to sustain her burden of disproving the prima facie correctness of his determination. He contends that there is nothing in the record to establish that the 3-1/2 percent interest factor used in the regulations is inconsistent with a representative or average yield from the 44 total obligations of Seagrave Corporation, and that the evidence does not support a valuation other than that determined by him. The respondent determined the value of the contract under the provisions of section 20.2031-7 of the Estate Tax Regs. Paragraphs (1) and (2) of subsection (a) provide that the fair market value of an annuity for a term certain is the "present value", computed by the use of the factors in Table II, under subsection (f) of section 20.2031-7 of the regulations. Table II provides factors upon which computations can be made to give the "present value" at 3-1/2 percent interest, of an annuity for a term certain. The regulations, under section 2031 of the 1954 Code, distinguish between the valuation of "commercial annuity contracts", valued under section 20.2031-8 of the regulations, and those which are not considered *300 to be commercial annuity contracts, which are valued under section 20.2031-7 of the regulations. The respondent valued the payments to be received by the decedent's estate, under the Seagrave contract, under section 20.2031-7 of the regulations, by applying the provisions of section 20.2031-7(a)(1) and (2), (b)(1) and (2), and (f) (Table II), to the facts set forth in the Seagrave contract. Under those provisions of the regulation, the present value of the remaining 233 semi-monthly payments, to be paid as of the time of the decedent's death, over a period of 9 years, 8-1/2 months, aggregating $143,178.50, was determined by the respondent to be $121,576.78, on the valuation date. Thepetitioner does not question the accuracy of respondent's computation under the regulations. The petitioner does not contend that the applicable regulations and table are invalid. Rather, the petitioner argues that "where the resulting value from the use of the table is substantially at variance with the facts, then the table may not be employed." A preliminary matter is noted, mainly for clarity, as there is no dispute about the valuation date. The petitioner elected to use the alternative valuation date, *301 August 28, 1962, in reporting the value of the assets of the estate. The respondent, in making his determination, took into consideration section 2032 of the Code and the regulations thereunder in order to determine the fair market value of the contract as of August 28, 1962. He considered the following points under section 2032, and the regulations thereunder: 1. Section 20.2032-1(b)(2) of the regulations, in the last sentence, provides that if the election is made to value the gross estate as of the alternate valuation date, such election applies to all the property included in the gross estate, and cannot be applied to only a portion of the property. 2. Paragraph (3) under section 2032(a) of the Code provides that if any property interest includable in the gross estate is affected by the mere lapse of time, such interest shall be included at its value as of the time of death (instead of the later date), with adjustments for any difference in its value as of the later date, not due to the mere lapse of time, 3. The meaning of the term "mere lapse of time", as applied to the facts in the instant case, must necessarily be construed to mean that the fact that 24 semi-monthly payments *302 were made from the date of decedent's death to the alternate valuation date would not affect the value of the 233 payments to be made as of the date of the decedent's death. Thus, the respondent valued the employment contract by determining the "present value" under section 20.2031-7 of the regulations of the 233 payments remaining to be paid as of the date of the decedent's death. Then, looking to the alternate valuation date, he looked for factors present at that later date, August 28, 1962, to determine whether any adjustments should be made to the value which had been ascertained as of the date of death. Finding no factors which would cause him to change the value, that is, factors other than those due to "mere lapse of time", the respondent concluded that the fair market value as of the alternate valuation date was identical to that determined as of the date of the decedent's death,i.e., $121,576.78. On this point, the petitioner does not dispute respondent's determination. In substance, the petitioner contends, first, that the 3-1/2 percent interest factor, as utilized in Table II under section 20.2031-7(f) of the regulations, is unrealistic, and that in lieu thereof some other *303 interest factor should be used in the neighborhood of 10 to 12 percent. This contention of the petitioner that from 10 to 12 percent is an appropriate factor is based on a method of valuation devised and formulated by petitioner's witness,x. The method of valuation used by X has been carefully considered. No useful 45 purpose will be served by describing the several steps employed by him in his method of arriving at the claimed value of $85,900, other than to state that his method assumes that the 3 1/2 percent interest factor in Table II of the regulation, section 20.2031-7(f), is too low, and that this factor should be increased to 6 percent or more. Briefly, X used a method of valuing the payments under the Seagrave contract which is known as a declining balance method of valuing fixed payments to be made during a certain period of time. He used a 6 percent interest factor and applied two discount factors of 25 percent and 20 percent. The dispute presents questions about whether the factor of 3 1/2 percent in Table II of the regulation should, under the facts of this case, be increased, and if so, by how much; and whether some method of valuation should be used other than that *304 prescribed in the regulations.Cf. Estate of Irma E. Green, 22 T.C. 728, 729; Huntington National Bank, 13 T.C. 760, 769-772. Petitioner had the burden of proving facts which would establish that the method for valuing the contract in issue prescribed by the respondent's regulation, section 20.2031-7(f), Table II, does not establish the fair market value of the contract on the valuation date. Seagrave Corporation was obligated under the contract to pay the decedent, or his designated beneficiary, or his estate, $1,229 per month in semi-monthly payments of $614.50, for a term certain, "absolutely, unconditionally, and without diminution, offset, counterclaim or cross claim (except as such diminution, offset, counterclaim or cross claim shall first be established by final judgment, if any, by a court of competent jurisdiction)". As of the valuation date, there was not any claim in issue, or contemplated, or adjudicated which would bring about any diminution of the amount of the contractual payments, and none has ever arisen. Seagrave made the required payments under the contract. The decedent, under the contract, did not have a monetary investment in the contract, and he did not have *305 the right to receive a lump sum payment. Rather, he or his beneficiary had the right to receive only a series of semimonthly payments during a certain period of time. The problem here is to determine the "present value" on the valuation date of the 233 semi-monthly payments which remained to be paid by Seagrave after the death of Roberts. Section 20.2031-7(a) prescribes a method for determining the fair market value of a series of payments to an annuitant under a contract which is not a commercial annuity contract issued by a company regularly engaged in the sale of commercial annuity contracts; and subsection (f) provides the tables to be used. The terms of the Seagrave contract and the general facts bring that contract, and the 233 semi-monthly payments during a term certain, squarely within the applicable regulation, and respondent's determination thereunder must be sustained, unless the petitioner has established that the resulting valuation is so unrealistic and unreasonable that either some modification in the prescribed method in the regulation should be made, Estate of Irma E. Green, supra; Huntington National Bank, supra; or a complete departure, in this instance, from the *306 prescribed method should be taken; and, if so, that a more reasonable and realistic means of determining the present value of this contract is available. SeeIthaca Trust Co. v. United States, 279 U.S. 151 (1929); Betty Dumaine,16 T.C. 1035 (1951); and Carl E. Weller, 38 T.C. 790, 803 (1962). In Estate of Irma E. Green, supra, p. 731, 732, this Court observed thatif the facts in a particular case so warrant, we may adopt a rate, either higher or lower than the factor employed in a regulation of the respondent for valuing an interest in property, which is appropriate to the facts and circumstances of a particular case. See, also, Huntington National Bank, supra; Hanley v. United States, 63 F. Supp. 73. Respondent does not question this, in principle. But the petitioner had the burden of over-coming the presumptive correctness of respondent's determination. Estate of Abraham Koshland, 11 T.C. 904, affd. 177 F. 2d 851, 853 (C.A. 9, 1949). In general, the method prescribed in the applicable regulations, in valuing an interest in property, is to be followed "unless the facts present a substantial reason for departure therefrom." Estate of Irma E. Green, supra,p 732; McMurtry v. Commissioner, 203 F. 2d 659, 666, 667 *307 (C.A. 1, 1953). The question of whether we should depart in this case from the valuation method provided and prescribed in the applicable regulation, so as to adjust a factor, or so as to approve a wholly different method of valuation, as proposed by petitioner, is free from doubt upon the facts here. Upon 46 consideration of all of the evidence, it is concluded that petitioner failed to introduce evidence of the existence of facts which establish that the respondent's regulation, as applied here, produced an unreasonable or unrealistic valuation of the Seagrave contract as of the valuation date. It is our conclusion that the evidence does not establish facts or substantial reasons for departing from the method of valuation prescribed in the applicable regulation, and that petitioner failed to overcome the prima facie correctness of the respondent's determination. The petitioner's witnesses expressed concern about the nature of the contract, including these factors; that the contract was not negotiable; that allegedly Seagrave, the obligor, did not guarantee the payments by some arrangement for funding or insuring them; that the contract was not in general a marketable one; that the *308 financial condition of the obligor might not be stable; and that the payments over a period of 9 years and 8 1/2 months were not guaranteed. Based upon such concerns, petitioner's witness expressed the view that the total payments under the contract should be discounted by 25 percent, and that the resulting figure should then be discounted by 20 percent. Whether or not such discounts of the contract payments should be made; and whether or not Seagrave might or might not be expected to meet its contractual obligation, involve questions of fact on the valuation date.Cf. Estate of Judson C. Welliver, 8 T.C. 165, 171 (1947); and Estate of John A. Hance, 18 T.C. 499 (1952). The evidence does not support the proposed discount factors, or the theory that Seagrave's financial condition on the valuation date was dubious, unsatisfactory, or such as to indicate defaults under the contract. Most non-commercial annuities for a period certain are non-negotiable, and lacking evidence to the contrary, it must be assumed that the 3 1/2 percent factor in Table II has taken into account the fact of non-negotiability. In addition, the evidence shows that Seagrave (1) increased its sales from 13.59 million *309 dollars to 36.80 million; (2) increased the earnings on its common shares from $0.52 to $1.55; (3) improved the ratio of its current assets to liabilities from 3.1 to 1, to 3.6 to 1; and (4) the market value of its common stock reached a seven-year high (1956 to 1962) of 13 7/8 in 1961. Furthermore, the brief testimony of petitioner's witness, X, about his reasons for using a factor of 6 percent interest, with respect to the obligation of Seagrave under the contract in issue is not adequate or sufficient to overcome the prima facie correctness of the factor of 3 1/2 percent interest used in respondent's Table II. There is no evidence that Seagrave had not made any precautionary arrangements whereby it would be able to meet its obligation under the contract to make all of the agreed payments. The availability of subsequent facts permits a court to evaluate the accuracy of opinions of value that may have been formed close to the valuation date. Tex-Penn Oil Co. v. Commissioner, 83 F. 2d 518 (C.A. 3, 1936), affd. 300 U.S. 481 (1937). The evidence shows that between 1961 and 1966, Seagrave's earnings increased, and the value of its common stock increased: (1) Its earnings per share increased *310 from $0.52 to as high as $2.61 in 1965 (after a 2 for 1 stock split in 1963). (2) Dividends were increased from a 4 percent stock dividend in 1961 to $0.40 per share, plus certain stock dividends in 1966 (after the 2 for 1 stock split in 1963). (3) And there was a price rise on its common stock from a low of 6 3/4 in 1961, to a high of 27 3/8 in 1966 (after the 2 for 1 stock split in 1963). Thus, not only is there no evidence that on the valuation date Seagrave could not have been expected to fulfill its contracutal obligation under the contract in question, but also there is evidence, which we may consider, that Seagrave was in a good financial position, and reasonably could be expected to comply with its obligation under the contract. Upon the entire record, we are not able to accept and approve the valuation of petitioner's witness, X, or of the other witness who expressed an opinion of a lower value. The ultimate question here is whether the evidence establishes that respondent's determination of fair market value under his regulation is unrealistic in view of actual facts. It is concluded that petitioner failed to prove that respondent's determination under the applicable regulations *311 and under the facts here is not the fair market value of the contract on the critical valuation date. Accordingly, it is found and held that the fair market value of the Seagrave contract was $121,576.78 as of August 28, 1962. In arriving at this conclusion, the testimony of each of petitioner's witnesses has been considered, but we are unable to conclude that the contract had a lower fair market value than the respondent determined. Our 47 conclusion also is that in general the petitioner failed to sustain her burden of proof. Issue II The second issue involves the determination of the fair market value on August 28, 1962, of several paintings, a drawing, and art objects owned by the decedent, which were among his household effects. Petitioner reported and claims that the total fair market value of the items in dispute was not more than $4,775. The respondent determined and claims that their fair market value was $8,275, or $3,500 more than was reported in the estate tax return. The question is one of fact; the petitioner had the burden of proof. The petitioner and the respondent, each, offered the testimony of a witness in support of the respective valuations claimed. Upon consideration *312 of all of the evidence, our finding and conclusion are that the total fair market value of the items in dispute was $4,775, and no more. The respondent's determination was incorrect. The petitioner has satisfied her burden of proof. Consideration has been given to the testimony and opinions of respondent's witness, an employee. Although he undertook the making of a systematic inquiry into the value of each one of the several items to be valued, he admittedly is not an expert, and some of his testimony is hearsay, and can be given little weight. Petitioner presented the testimony and opinions of a professional appraiser, who makes appraisals of such items, who buys and sells antiques and objects of fine art, and who has been engaged in the business of appraising and dealing in art goods for 30 years. He operates a business in New York City of buying and selling art goods. We are satisfied that the petitioner's witness is a well qualified appraiser, and that his opinions and valuations of the particular items involved are credible, substantially sound, and realistic. His opinions and testimony overcame the prima facie correctness of the respondent's determination. On the other hand, *313 the testimony and opinions of the respondent's witness are not convincing and did not establish that the valuations of petitioner's witness were either incorrect or not entitled to receive due weight. Decision will be entered under Rule 50. Footnotes
1. in millions of dollars. ↩
2. stock dividends of 8 percent in 1956; 4 percent in 1958; 3 percent in 1959; 7 percent in 1960; and 4 percent in 1961 and 1962. ↩
3. Pro forma; reflects acquisition of Irving Tanning Co. ↩
6. plus 2 percent stock and also 1/5 share Custom Built Homes common; and reflects an adjustment for a 2-for-1 stock split in 1963.
4. net after reduction for special non-recurring charge of 1.03 millions of dollars. ↩
5. net after reduction for special non-recurring charge of 1.24 per share. ↩